Obed A. KALWITZ, Jr., Rolene Kalwitz, Obed Kalwitz, III, and Lorene Mohlke, Appellants–Defendants,

v.

ESTATE OF Helen KALWITZ and Estate of Obed A. Kalwitz, Sr., Appellees–Plantiffs.

No. 46A05–0405–CV–263.

Court of Appeals of Indiana.

Feb. 15, 2005.

Transfer Denied May 26, 2005.

David R. Phillips, Sturm & Phillips, Valparaiso, IN, Attorney for Appellants.

Stephen A. Kray, LaPorte, IN, Attorney for Appellees.

## OPINION

CRONE, Judge.

### Case Summary

Obed Kalwitz, Jr. ("Obed, Jr."), Rolene Kalwitz[1] ("Rolene"), Obed Kalwitz, III ("Obed, III"), and Lorene Mohlke ("Mohlke") (collectively, "the Appellants") appeal a judgment imposing a constructive trust on real property in favor of the estate of Obed Kalwitz, Sr. ("Obed, Sr."), and the estate of Helen Kalwitz ("Helen") (collectively, "the Estates" or "the Appellees"). We affirm.

### Issue

The Appellants challenge the sufficiency of the following two findings:

I.   That Obed, Jr. had a confidential or fiduciary relationship with his parents or exercised dominance over them; and

II.   That Obed, Jr. and Rolene acted in concert to induce and persuade Obed, Sr. and Helen to convey land to Obed, III and Mohlke.

### Facts and Procedural History

The facts most favorable to the judgment[2] are as follows. In 1940, Obed, Sr.

---

1.   Rolene is Obed, Jr.'s wife.

2.   In presenting their respective statements of facts, the parties cite the trial court's judgment in the Appellants' appendix rather than the transcript of the trial. While Appellate Rule 46(A)(6)(a) states that the "facts shall be supported by page references to the Record on Appeal or Appendix in accordance with Rule 22(C)," in a case where the factual find-

married Helen, and four children were born to the marriage: Obed, Jr., Eugene, Sharon Grieger,[3] and Ted. Appellees' App. at 6 (pretrial order, stipulations of parties). Obed, Sr. and Helen raised their children at their home on a 331–acre farm in La-Porte County. *Id.* at 6–7. By the late 1970s, Obed, Sr. and Helen had acquired approximately 271 additional acres of farm land in LaPorte County. Although Obed, Sr. and Helen owned the property, they farmed it as a partnership with their children, sharing in the expenses and profits. *Id.* Obed, Jr. became the head of the Kalwitz family farm operation and was responsible for the day-to-day operation of the farm. *Id.*

By 1979, Ted died, and Obed, Jr. and his son, Obed, III,[4] were the family members farming the entire farm. *Id.* Also that year, Obed, Sr. and Helen went to their family attorney, Thomas Sallwasser, and prepared an estate plan. *Id.* The plan provided that their 331–acre farm was to be shared equally by Sharon and Eugene after a life estate in the surviving spouse. Their 271–acre farm was to be shared equally by Obed, Jr. and Eugene after a life estate in the surviving spouse. This estate plan was embodied in mutual wills, which have been admitted to probate. *Id.*

Sharon resided with her parents until she married in approximately 1966. She was continuously employed outside the family farm for thirty-two years. Sharon often assisted Helen by providing transportation for errands, appointments, and shopping—particularly after Obed, Sr.'s

1989 death. Eugene lived with his parents until Helen's 1995 death. He too was employed full-time outside the family farm, but assisted in the farming efforts as time permitted.

In the early 1980s, several significant events occurred. Obed, Jr. assumed financial management of the farm, paying bills and assembling tax information. The farm checking account was changed from requiring endorsements by two of the following people, Obed, Sr., Helen, Obed, Jr., and Eugene, to requiring only Obed, Jr.'s signature. Obed, Jr. acquired interests in two parcels of farmland independent of the Kalwitz family; one was a 188[5] acre parcel and the other was a 142 acre parcel, referred to as the Tofte purchase. Tr. at 32. The Kalwitz family attained a farm loan from the Production Credit Association ("PCA").

In the mid–1980s, Obed, Jr. engaged in discussions concerning his desire for a written contract regarding his role on the farm. Obed, Sr., Helen, Attorney Salwasser, Obed, Jr., and an attorney he retained met to discuss a written management contract. Ultimately, no agreement was reached. In late October, 1985, PCA sued Obed, Sr., Helen, Eugene, Obed, Jr., and Rolene, alleging that the Kalwitzes were delinquent in the sum of $354,793.78 and seeking foreclosure on the mortgage liens on the 271 acre parcel held in the names of Obed, Sr. and Helen. Obed, Jr. and Rolene undertook the defense of the suit, hiring an attorney, who filed a counterclaim alleging lender fraud. The trial

---

ings of a judgment are challenged, citations to the transcript would be far more helpful for our review.

3. Grieger is Sharon's married name.

4. According to our calculations, Obed, III would have been approximately eight years old in 1979.

5. There are discrepancies regarding the size of this parcel. While the trial court's judgment states, "188," Appellants' App. at 50, Appellants' brief states, "108," and Appellees' brief notes a purchase of 230 acres in 1982.

court dismissed the counterclaim. The Kalwitzes filed an interlocutory appeal, which was dismissed on September 8, 1986.

On November 21, 1986, other acreage owned by Obed, Jr. was recorded in the names of Obed, III and Mohlke, the children of Obed, Jr. and Rolene. On November 26, 1986, title to the 331 acres of land was transferred from Obed, Sr. and Helen to Obed, III and Mohlke. The transfer deeds, which were prepared by Rolene, included a total purchase price of $40.00 for the 331 acres.[6] When questioned by his sister, Sharon, about the transaction, Obed, Jr. explained that he caused title to the 331 acres to be transferred to the names of his children as a temporary measure to protect the property from the PCA litigation, and that he would transfer the property back to Obed, Sr. and Helen at the conclusion of the PCA litigation.

Following the 1986 title transfer, Obed, Jr. and Rolene built a home on the 331 acres where they continue to reside. Obed, Sr. and Helen continued to live on the property for the rest of their lives. Obed, Sr., along with Eugene, undertook maintenance and repairs to the family home until Obed, Sr.'s 1989 death. Thereafter, Eugene continued to reside in the family home and help out as time permitted. He and Sharon assisted Helen. Obed, Jr. continued farming the 331 acres and was the primary operator and manager of the farm.

In June 1994, as Sharon looked on, Obed, Jr. asked Helen to sign certain documents. Helen responded that she would not sign any papers for him "until he gave her property back to her." Tr. at 126. Obed, Jr. replied that he would return title to the property once the litigation brought by PCA had ended.

In April 1995, Helen died. On the day of Helen's funeral, Obed, Jr. placed a locked gate at the entrance to the 331 acres, barring Eugene from returning to his residence. Also on that day, Sharon learned that Obed, Jr. had no intention of returning title to the 331 acres to the Estates. In the fall of 1995, the litigation originally instituted by PCA in 1985 was resolved by mutual dismissal of all pending claims. The Kalwitzes did not have to pay PCA any money, and the recorded mortgage lien held by PCA on the 331 acres was removed.

Further facts and procedural history were outlined as follows in the first published appeal of this dispute:

> On October 17, 1995, Helen's Estate filed a "Complaint for Return of 331 Acres" against the [Appellants], seeking an order declaring a constructive trust on the property and to quiet title to the property in Helen's Estate or Helen's beneficiaries. The one-count complaint, which did not expressly identify any theory for the imposition of a constructive trust, alleged that Obed, Sr. and Helen deeded 331 acres to Obed[,] III and [Mohlke] at the request and instruction of Obed, Jr. and his wife, Rolene; that Obed, Jr. and Rolene occupied a position of trust and confidence with Obed, Sr. and Helen at the time of the transfer; that the transfer was made without consideration to protect the property from an adverse judgment in a pending lawsuit; that the transfer was made with the understanding and in reliance upon Obed, Jr. and Rolene's promise to return the property to them at the conclusion of the pending LPCA litigation;

6. An appraisal performed nine years later revealed that the 331 acres had a value of $1100 to $1200 per acre.

and that the [Appellants'] refusal to return the land was unreasonable, in bad faith, and an attempt to defraud the Estate.

On November 9, 1995, the [Appellants] filed a motion to dismiss the complaint pursuant to Ind. Trial Rule 12(B)(6), and Helen's Estate responded with a motion for summary judgment, seeking the imposition of a constructive trust based upon a constructive fraud theory, though not expressly designated as such. After conducting a hearing, the trial court denied both motions.

On July 10, 1996, Obed, Sr.'s Estate, Sharon, and Eugene filed a complaint against the [Appellants] which was nearly identical to the complaint filed by Helen's Estate. [Appellants] subsequently moved for summary judgment on the Estates' complaints, which they characterized as asserting a claim to declare the 1986 deeds invalid as conveyances to defraud creditors. The Estates countered with a cross-motion for summary judgment, claiming that, as a matter of law, the 1986 deeds are invalid for being the product of the unauthorized practice of law and that the deeds are fraudulent conveyances as to the third-party beneficiaries under Obed, Sr. and Helen's mutual wills. After a hearing, the trial court entered summary judgment in favor of [Appellants], simply concluding that the 1986 deeds were valid.

*Estates of Kalwitz v. Kalwitz*, 717 N.E.2d 904, 908–09 (Ind.Ct.App.1999), ("*Kalwitz I*"). The *Kalwitz I* panel affirmed the trial court's entry of summary judgment in favor of the Appellants on the fraudulent conveyance and unauthorized practice of law claims, but reversed the entry of summary judgment on the constructive fraud claim. *Id.* at 915.

"On remand, after a bench trial, the trial court found a constructive trust in favor of the Estates and ordered that the title to the disputed real property be conveyed to the Estates." *Kalwitz v. Estates of Kalwitz*, 759 N.E.2d 228, 229 (Ind.Ct.App. 2001), ("*Kalwitz II*"), *trans. denied.* The Appellants appealed from that order and presented a single dispositive issue: "whether the trial court abused its discretion when it found that the Estates had not waived the Dead Man's statute." *Id.* The *Kalwitz II* panel concluded that the trial court "abused its discretion when it found that the Estates had not waived the Dead Man's statute." *Id.* at 233. Accordingly, the *Kalwitz II* court remanded for a new trial and instructed: "assuming that the Estates again introduce into evidence either deposition testimony or admissions rendering the Dead Man's statute waived, the trial court should allow Obed, Jr. to testify regarding matters which occurred both prior to and after the deaths of Obed, Sr. and Helen." *Id.* The *Kalwitz II* court further concluded that the Dead Man's statute section applicable to suits by or against heirs or devisees founded on a contract with or demand against an ancestor did not apply to render the co-executors of the estate incompetent to testify. *Id.* at 234.

On March 3, 2004, Special Judge Steven King held a bench trial. The Appellants requested specific findings of fact and conclusions of law pursuant to Trial Rule 52(A). On April 16, 2004, the court issued a "Judgment Imposing Constructive Trust on Real Property in Favor of Estates." Appellants' App. at 45–63. Appellants appeal this order.

### Discussion and Decision

#### I. Fiduciary, Confidential, or Dominant Role

The Appellants assert that the trial court erred in imposing a constructive

trust upon the 331 acres as there was a failure of proof. Specifically, the Appellants contend, "there is no evidence to support the Court's finding that a fiduciary or confidential relation should have existed and also a failure of proof as to whether Obed, Jr. had a dominant role in his relationship with his parents." Appellants' Br. at 8.

We utilize a two-tiered analysis to review the trial court's numerous findings of fact and conclusions. *Oil Supply Co., Inc. v. Hires Parts Serv., Inc.*, 726 N.E.2d 246, 248 (Ind.2000). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.* We may not reweigh the evidence or assess the credibility of witnesses. *Id.* Rather, we consider only the evidence favorable to the trial court's judgment. *Id.* We may reverse only if the findings or judgment are clearly erroneous. *Id.* That is, we must affirm the judgment of the trial court unless the evidence points incontrovertibly to an opposite conclusion. *Wagner v. Estate of Fox,* 717 N.E.2d 195, 200 (Ind.Ct. App.1999) (citations omitted).

[5, 6] As in *Kalwitz I,* we review the law on constructive trusts. *See Kalwitz I,* 717 N.E.2d at 912–15. A constructive trust is a creature of equity, devised to do justice by making equitable remedies available against one who through fraud or other wrongful means acquires property of another. *Criss v. Bitzegaio,* 420 N.E.2d 1221, 1224 (Ind.1981); *Shafer v. Lambie,* 667 N.E.2d 226, 229 (Ind.Ct.App.1996). Discussing the law on constructive trusts, our supreme court has stated:

> A constructive trust is imposed where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it. The duty to convey the property may rise because it was acquired through fraud, duress, undue influence or mistake, or through a breach of a fiduciary duty, or through the wrongful disposition of another's property. The basis of the constructive trust is the unjust enrichment which would result if the person having the property were permitted to retain it.

*Melloh v. Gladis,* 261 Ind. 647, 656, 309 N.E.2d 433, 438–39 (1974) (citing 5 SCOTT ON TRUSTS § 404.2). This type of trust is more in the nature of an equitable remedy than an independent cause of action, *Chosnek v. Rolley,* 688 N.E.2d 202, 211 (Ind.Ct. App.1997), and the law is firmly established that fraud, either actual or constructive, is a prerequisite to the imposition of a constructive trust. *Brown v. Brown,* 235 Ind. 563, 568, 135 N.E.2d 614, 616 (1956).

Constructive fraud "arises by operation of law from a course of conduct which, if sanctioned by law, would 'secure an unconscionable advantage, irrespective of the existence or evidence of actual intent to defraud.'" *Paramo v. Edwards,* 563 N.E.2d 595, 598 (Ind.1990) (quoting *Beecher v. City of Terre Haute,* 235 Ind. 180, 184–85, 132 N.E.2d 141, 143 (1956)). It is "based on the premise that there are situations which might not amount to actual fraud, but which are 'so likely to result in injustice that the law will find a fraud despite the absence of fraudulent intent.'" *Stoll v. Grimm,* 681 N.E.2d 749, 757 (Ind. Ct.App.1997) (quoting *Scott v. Bodor, Inc.,* 571 N.E.2d 313, 324 (Ind.Ct.App.1991)).

Constructive fraud may be found where one party takes unconscionable advantage of his dominant position in a confidential or fiduciary relationship. *Id.; see Hall v. Ind. Dep't of State Revenue,* 170 Ind.App. 77, 80, 351 N.E.2d 35, 38 (1976) ("Any breach of a duty arising from a confidential or fiduciary relation, without

any actual fraudulent intent gains an advantage at the expense of any one to whom he owes such duty, amounts to a constructive fraud."). In addition, a representation regarding future conduct can, in some situations, give rise to a constructive fraud. *Wells v. Stone City Bank,* 691 N.E.2d 1246, 1250 (Ind.Ct.App.1998), *trans. denied.* For example, a constructive trust may arise where there is a confidential relationship between the grantor and the grantee, and the grantor relies upon the transferee's promise to reconvey the property in the future. 76 AM.JUR.2D TRUSTS, §§ 219–222, p. 244, 247–48. It has been stated that the mere violation of an oral promise made by the grantee of land to the grantor to reconvey the land back to the grantor does not create a constructive trust; however, a constructive trust may arise where, in addition to an oral promise to reconvey, there is "fraud or constructive fraud arising out of a confidential or fiduciary relationship where one party dominates a weaker party who reposes confidence in that dominant party." *Hunter v. Hunter,* 152 Ind.App. 365, 371 n. 1, 283 N.E.2d 775, 779 n. 1 (1972). A confidential or fiduciary relationship exists when confidence is reposed by one party in another with resulting superiority and influence exercised by the other. *Drudge v. Brandt,* 698 N.E.2d 1245, 1250 (Ind.Ct.App.1998). The question of whether a confidential relationship exists is one of fact to be determined by the finder of fact. *Dawson v. Hummer,* 649 N.E.2d 653, 661 (Ind.Ct.App.1995).

In its judgment, the trial court made the following relevant findings:

19. "By the year 1997, Obed, Jr. had been the primary operator of the family farm for over 40 years. The family had consented to his possession and control of the farm for over 40 years. By 1979, Obed, Jr. and his son, Obed, III, were the family members farming the entire farm." [Appellees' App. at 7 (stipulations of parties) ].

20. Notwithstanding the stipulation of the parties set forth in paragraph 18, Obed Kalwitz, Jr. denied under oath at trial that he had been "the manager" of the farm. That denial also contravened his affirmation under penalties of perjury in his "Verified Complaint to Enforce Mutual Wills" filed in these cases on February 13, 1997 (see paragraph 13) in which Obed, Jr. verified that he "managed" the farm.

21. .... Obed, Jr. conceded that his operation of the family farm was for the benefit of all family members, including both his parents and siblings. [Tr. at 58–59].

22. .... [I]t was Obed, Jr., who instituted a lawsuit against [Roger Tomlinson] on behalf of the farming operations.... [Tr. at 45–46].

23. The 1980's brought increased authority and influence to Obed, Jr.'s role in the management and operation of the Kalwitz farm. He assumed the financial management of the farm, paying the bills and assembling the farm tax information. The farm checking account was transformed. During the 1970's that account included four names—Obed Kalwitz, Sr., Helen Kalwitz, Obed Kalwitz, Jr. and Eugene Kalwitz—and required the endorsement of at least two signatures on a check, by 1981 or 1982 the farm checking account required only the signature of [Obed, Jr.]. And, during that period, Sharon Grieger overheard [Obed, Jr.] giving directive to Obed, Sr. to go to different places and check on the grain prices. [Tr. at 131, 138–39, 161–62].

30. Obed Kalwitz, Jr. and his wife Rolene undertook the family defense of the litigation instituted by [PCA]. Obed Kal-

witz, Jr., obtained the services of attorney Rick Gikas and was the family member who primarily assisted Mr. Gikas in that defense. Evidence indicated that Mr. Gikas spoke with other family members on a limited basis. [Appellees' App. at 7 (stipulations of parties); Tr. at 139].

Appellants' App. at 48–50, 52 (bracketed citations added).

Having reviewed the citations to the transcript and stipulations, we conclude that the above findings were supported by sufficient evidence. Moreover, the above findings support the trial court's conclusion that a "confidential and a fiduciary relationship each existed between" Obed, Sr. and Helen, as husband and wife, "vis-à-vis their son, [Obed, Jr.]. That confidential and fiduciary relationship existed by reason of the long-standing management role of [Obed, Jr.] on the family farm and the accompanying parent-child relationships." Appellants' App. at 59 (conclusion # 54). Recalling that we will reverse a finding regarding a confidential relationship only when there is *no* evidence to support it or we reach a definite and firm conviction that a mistake has been made, *see Matter of Estate of Neu,* 588 N.E.2d 567, 571 (Ind.Ct.App.1992), we have no difficulty upholding the finding of a confidential and fiduciary relationship here.

▮ We are equally unimpressed with the Appellants' challenge to the following conclusion:

Via Obed, Jr.'s role as operator and manager of the farm, his assumption of the defense of the [PCA's] mortgage foreclosure action, his superior knowledge of the law surrounding that litigation, the duress which that litigation brought upon Obed, Sr. and Helen Kalwitz, the confidence and trust long reposed in Obed, Jr. with respect to decisions concerning the farm, and through the nature of their respective personalities and Obed, Jr.'s aggressive qualities, Obed, Jr. exercised a dominant position in his relationship with his parents.

Appellants' App. at 59 (conclusion # 55). This conclusion was well-supported by the following findings:

14. .... It was common—particularly after the death of [Obed, Sr.]—that [Sharon] often assisted Helen Kalwitz by providing transportation to and from local towns for errands, appointments, and for shopping. [Tr. at 135].

21. [D]uring the 1960's Obed Kalwitz, Sr. was employed on a full-time basis with Allis–Chalmers and "helped out" as time permitted on the farm. After a fall in which he broke both knees, Obed Sr. retired from Allis–Chalmers in the 1970's and was able to dedicate more time and did drive a tractor during harvest time, it remains that, as Rolene Kalwitz so stated in an affidavit, Obed Kalwitz, Sr. "did little work on the farm." ... [Tr. at 130–31, 159–60, 174].

23. .... And, during that period [early 1980s], Sharon Grieger overheard [Obed, Jr.] giving directives to Obed, Sr. to go to different places and check on the grain prices. [Tr. at 138–39].

24. .... According to Obed, Jr., his decision to enter into the "Tofte" purchase in February of 1982 was made without interference from Obed Kalwitz, Sr. who, according to Obed, Jr., was "too old" at that time to mount resistance to the decision. [Tr. at 32–37].

37. In June of 1994, Sharon Grieger was present at the "homeplace" when Obed, Jr. asked their mother Helen to sign certain documents. On that date Helen Kalwitz indicated to Obed, Jr. that she would not sign any papers for him "until he gave her property back to her." In response, Obed, Jr. indicated

that he would return title to the property once the litigation brought by [PCA] had ended. [Tr. at 126–27].

41. The litigation brought by [PCA] placed both Obed Sr. and Helen Kalwitz under significant stress. That stress was so significant that Obed, Jr. once characterized it as the cause of death of his father, Obed, Sr. [Tr. at 40–41].

42. Throughout the litigation Obed, Jr. would occasionally attempt to inform his mother Helen of the status of the litigation but, according to Obed, Jr., she "didn't understand that legal stuff." [Tr. at 42].

43. Following the transfer of the title to the 331 acres of farmland from Obed Sr. and Helen Kalwitz to Obed, III, and Lorene Mohlke, in 1986, no significant changes resulted.

Both Obed, Sr. and Helen Kalwitz continued to live on the property until their death. .... Until his death in 1989, Obed Sr. and Eugene would undertake maintenance and repairs to the family home; subsequent to this death, Eugene cared for his mother's daily needs and continued to perform maintenance at the residence.... [Tr. at 127–28].

46. Obed, Jr. was described in testimony as "domineering," "dictatorial," and "demanding." In contrast, Obed Kalwitz, Sr. was described as an "easygoing" and generous man who was always willing to help others. Evidence established that Obed, Jr. routinely commanded Obed, Sr. to perform certain tasks on the farm and that Obed, Sr. routinely complied with those directives.

Kenneth Rutz, a local farmer who has known the Kalwitz family since 1974 and often assisted the Kalwitzes with their harvest during the 1980's, testified that Obed, Jr. "really ran the operation" and gave directives to everyone, including Obed, Sr. on the tasks to be performed. Mr. Rutz never witnessed [Obed, Sr.] give directives to Obed, Jr. Rutz described Obed, Sr. as a reticent and passive person who did whatever he was told to do by Obed, Jr.

Rutz described Obed, Sr. and Helen as "laid back" in nature and opined that the two "would accept ... almost anything within reason" and "that if any of the children had wanted to push them in a certain direction, it wouldn't have been difficult."

Obed, Jr., was characterized as the "ramrod" or "boss" of the family farming operation by Rutz. It was Rutz's recollection that if Obed, Sr. ever made any decisions concerning the farming operation, it was at the direction of [Obed, Jr.]. [Tr. at 132, 138–39, 154–57, 159, 170–71].

Appellants' App. at 47–57. Our review of the transcript convinces us that the above findings were supported by abundant evidence.

## II. Action in Concert

■ Next, the Appellants assert that there is no evidentiary basis from which the trial court could have concluded that Obed, Jr. and Rolene, acting in concert, induced and persuaded Obed, Sr. and Helen to convey title to the 331 acres to Obed, III and Mohlke. That is, the Appellants challenge conclusion # 59, which states:

[Obed, Jr.] and Rolene ..., acting in concert, induced and persuaded [Obed, Sr.] and Helen ... to convey title to the 331 acre "homeplace" to [Obed, III] and.... Mohlke. That transaction was predicated upon the representation that once the litigation with [PCA] had concluded, the 331 acre "homeplace" would be reconveyed to Obed, Sr. and Helen. The remedy of a constructive trust is warranted if a promise regarding future

conduct is coupled with a confidential relationship between the parties.

Appellants' App. at 60. Again, we disagree with the Appellants.

Here, the facts most favorable to the findings and conclusions reveal the following. Obed, Jr. and his son managed and ran the family farm for many years despite the absence of a management contract. Obed, Sr. and Helen, with their attorney, planned via mutual wills for the 331 acres to be divided among Sharon and Eugene and the 271 acres to be divided among Obed, Jr. and Eugene. Obed, Jr. and Rolene, his wife, handled the defense of the PCA action. Within two months of the failed attempt to dismiss the PCA action, Rolene drafted the deeds transferring the 331 acres from Obed, Sr. and Helen to Obed, III and Mohlke, Rolene and Obed, Jr.'s children. The deeds included consideration of a mere $40 for land later appraised at between $1100 and $1200 per acre, not including the buildings thereon. Although present during Obed, Jr.'s failed negotiations for a farm management contract, Obed, Sr. and Helen's attorney was not present at the signing of the transfer deeds. At the time of the transfer, Obed, III was sixteen years old, a dependent of Obed, Jr. and Rolene, and subject to their control. The transfer enabled Obed, Jr. and Rolene to continue residing on the 331 acres through the date of trial and to bar Eugene from the property on the day of Helen's funeral and thereafter. Abundant evidence of a confidential and fiduciary relationship, as well as Obed, Jr.'s dominance, was presented. Given the circumstances presented by this case, and applying the appropriate standard of review, we have little difficulty concluding that Obed, Jr. and Rolene, acting in concert, induced and persuaded Obed, Sr. and Helen to convey title to the 331 acres to their children.

In affirming the trial court, we acknowledge the few findings that might tend to support Obed, Jr.'s argument, but note that many of these recount Obed, Jr.'s testimony. As evidenced by the following enlightening footnote, the trial court had grave doubts regarding Obed, Jr.'s testimony:

An inability to recall, delayed response times to answers, and evasive testimony was a common thread to the testimony of Obed, Jr. during questioning by counsel for the estates. So it is that coupled with the incredible nature of his testimony set forth in paragraph 35 and his demeanor as a witness, Obed, Jr.'s general credibility as a witness is regarded as lacking in trustworthiness. Finding 20 details Obed, Jr.'s attempt to reject his own factual stipulation. For all these reasons the phrase "according to Obed, Jr." is sometimes utilized herein.

Appellants' App. at 53. This footnote underscores the importance of the trial court's function as the sole judge of the weight of the evidence and the credibility of the witnesses. *Jennings v. State*, 553 N.E.2d 191, 192 (Ind.Ct.App.1990). Again, we may not reweigh the evidence or assess the credibility of witnesses, but instead consider only the evidence favorable to the trial court's judgment. *Oil Supply Co.*, 726 N.E.2d at 248. Unless the evidence points incontrovertibly to an opposite conclusion, we are bound to affirm the judgment of the trial court. *Wagner*, 717 N.E.2d at 200. The Appellants have not met the standard required for reversal.

Affirmed.

RILEY, J., and ROBB, J., concur.