Manuel R. MORFIN, Appellant–Respondent,

v.

In the Matter of the Supervised ESTATE OF James R. MARTINEZ, Appellees–Petitioners.

No. 45A04–0405–CV–267.

Court of Appeals of Indiana.

July 26, 2005.

Lonnie M. Randolph, Law Office of Lonnie M. Randolph, East Chicago, for Appellant.

Anthony DeBonis, Jr., Smith & DeBonis, LLC, Highland, for Appellees.

## OPINION

BARNES, Judge.

### Case Summary

Manuel Morfin appeals the trial court's entry of judgment against him in the amount of $101,796 in an action brought by beneficiaries of the estate of James Martinez. We affirm.

### Issues

The issues we address today are:

I. whether the Dead Man's Statute should have precluded the testimony of several witnesses;

II. whether the beneficiaries, Martinez's minor children, waived some of their claims against Morfin; and

III. whether the trial court's judgment, effectively imposing a constructive trust upon Morfin's assets in the amount of $101,796, is supported by the evidence.

### Facts

The facts most favorable to the trial court's judgment follow. In early 2001, Martinez, who had worked at Ispat Inland for thirty-two years as a pipe fitter, was diagnosed with cancer. By late July 2001, doctors advised Martinez that he needed

to put his affairs in order. Martinez's companion, Fran McWhirter, contacted attorney James Martin to create an estate plan and draft Martinez's will. Martinez's primary concern was to provide for his two minor children Connie and Jessica Martinez, who resided with his ex-wife Marie Brigham.[1]

On August 15, 2001, Martinez met with Martin to discuss his will. Morfin, Martinez's uncle, was also present. Martin advised, and Martinez agreed, that the best way to provide for Connie and Jessica was to have his will create a testamentary trust for their benefit. Martin specifically advised Martinez against leaving the life insurance and pension proceeds directly to Morfin, even though Martinez wanted Morfin to take care of his daughters after his death. The trust would be funded in part by $75,000 in life insurance Martinez had through Ispat Inland, as well as by a guaranteed five-year pension benefit from Ispat Inland. Morfin was to be named trustee of this trust. Martin stated that Morfin did not appear to be pleased with this arrangement and presumably preferred to be the direct recipient of the life insurance and pension benefits. As Martin testified, "At one point we were discussing the appropriate beneficiary designations for insurance, he [Morfin] was stating that he would take care of the daughters himself." Tr. p. 48. Morfin also was named executor of the will and personal representative of the estate. At the August 15 meeting, Martin also had Martinez fill out a change of beneficiary form for the life insurance, naming Martinez's estate as sole beneficiary. Martin also advised Martinez to allow his estate to receive the pension benefits, which could

be accomplished by naming no beneficiary for it.

On August 16, 2001, a United Steel Workers representative and an Ispat Inland employee met with Martinez in his home to enroll him in the pension plan. Morfin again was present in the house, but did not participate in the meeting. Martinez signed another beneficiary form for his life insurance, again naming his estate as beneficiary. However, when designating a beneficiary for the pension, Martinez named Morfin. When asked why he was doing so, Martinez replied that Morfin was "going to take care of my kids." Tr. p. 226.

Martinez died on August 30, 2001. Morfin thereafter sought Martin's assistance in administering the estate. Martin, however, discovered that both the life insurance proceeds and pension benefit from Ispat Inland were being paid directly to Morfin rather than to the estate and the testamentary trust, contrary to what Martin believed Martinez intended based upon their August 15 meeting. Specifically, Ispat Inland paid the life insurance proceeds to Morfin based upon a signed but undated change of beneficiary form that listed Morfin as primary beneficiary, and which form happened to be the last one received by Ispat Inland's office; it appears from the evidence that this form was actually signed before the one Martinez signed at Martin's office on August 15, 2001.[2] Martin advised Morfin that he could disclaim the life insurance and pension payments so that they could go to the estate; otherwise, Martin told Morfin, he could not represent the estate based upon the conflict between what Martin believed Martinez intended

---

1. Martinez had three other children whom he expressly disinherited in his will.

2. Ispat Inland attempted to inform the insurance company that the proper beneficiary for the life insurance should have been the estate, not Morfin, but the attempt came too late to prevent payment to Morfin.

regarding his estate plan and Morfin's receipt of the life insurance and pension proceeds.

Morfin did not disclaim, nor did he use the life insurance and pension proceeds to benefit Connie and Jessica, despite requests from Martinez's ex-wife Brigham and his mother, Morfin's sister. Instead, he used the funds to pay credit card bills and personal taxes, to pay an attorney in a different matter, to go on a vacation, to send a cousin on a vacation to Argentina, and to buy stocks and other securities for his own benefit. He also paid for Martinez's funeral out of these funds and could not recall how approximately $15,000 of the funds were spent.

Morfin opened Martinez's estate on October 24, 2001. On December 6, 2001, Brigham filed a petition to recover the $25,000 statutory allowance[3] for Connie and Jessica from Martinez's estate, which the trial court granted. On August 8, 2002, Morfin filed an inventory for the estate, listing personal property in the amount of $51,050 and real property worth $24,500. On October 16, 2002, Brigham filed a petition on behalf of Connie and Jessica objecting to the inventory and seeking the removal of Morfin as personal representative. The petition also sought an accounting for the life insurance proceeds and pension benefits, as well as a judgment against Morfin "for the dissipation and loss of assets to the Estate occasioned by his unlawful, negligent and fraudulent activities . . . ." App. p. 88.

The trial court conducted a bench trial, commencing on April 7, 2004. At the beginning of trial, Morfin resigned as personal representative and Martinez's brother Tom Martinez was appointed successor personal representative. On April 28, 2004, the trial court entered a judgment

with accompanying findings and conclusions. The court concluded in part, "the life insurance benefit and the pension benefit both already paid and to be paid in the future were impressed with a constructive trust for the sole use and benefit of Connie Martinez and Jessica Martinez." *Id.* at 18. It also found that Morfin had improperly expended all of the life insurance and pension proceeds on himself, save for the payment of some estate expenses, and entered judgment against him in the amount of $101,796. The court also imposed an equitable lien on all of Morfin's individual property in that amount for transfer to the testamentary trust established by Martinez's will for Connie's and Jessica's benefit. Morfin now appeals.

## Analysis

### I. Dead Man's Statute

Morfin first argues that the trial court erroneously considered the testimony of several individuals in violation of the Indiana Dead Man's Statute. The relevant part of the statute for purposes of this case provides:

(a) This section applies to suits or proceedings:

(1) in which an executor or administrator is a party;

(2) involving matters that occurred during the lifetime of the decedent; and

(3) where a judgment or allowance may be made or rendered for or against the estate represented by the executor or administrator.

\* \* \* \* \*

(d) Except as provided in subsection (e), a person:

(1) who is a necessary party to the issue or record; and

3. *See* Ind.Code § 29–1–4–1.

(2) whose interest is adverse to the estate;

is not a competent witness as to matters against the estate.

(e) In cases where:

(1) a deposition of the decedent was taken; or

(2) the decedent has previously testified as to the matter;

and the decedent's testimony or deposition can be used as evidence for the executor or administrator, the adverse party is a competent witness as to any matters embraced in the deposition or testimony.

Ind.Code § 34–45–2–4.

Case law has listed five requirements for finding a witness to be incompetent under the Dead Man's Statute: (1) the action must be one in which an administrator or executor is a party, or one of the parties is acting in the capacity of an administrator or executor; (2) the action must involve matters that occurred during the lifetime of the decedent; (3) it must be a case in which a judgment or allowance may be made or rendered for or against the estate represented by such executor or administrator; (4) the witness must be a necessary party to the issue and not merely a party to the record; and (5) the witness must be adverse to the estate and must testify against the estate. *Johnson v. Estate of Rayburn*, 587 N.E.2d 182, 184 (Ind.Ct.App.1992) (*superseded by statute on other grounds as recognized in Gipperich v. State*, 658 N.E.2d 946 (Ind.Ct.App. 1995)). The purpose of the Dead Man's Statute is to protect estates from spurious claims. *Id.* A trial court's ruling on witness competency under the Dead Man's Statute is reviewed for an abuse of discretion. *Id.*

Putting aside the question Brigham raises of whether Morfin adequately objected to the challenged testimony, we cannot say the trial court abused its discretion in considering it. The essential problem with most of Morfin's arguments is that they fail to address the fifth requirement for excluding testimony under the Dead Man's Statute: whether the witness is adverse to the estate and will testify against the estate. An adverse interest that would render a witness incompetent is one by which the witness will gain or lose by the direct, legal operation of the judgment. *Senff v. Estate of Levi*, 515 N.E.2d 556, 558 (Ind.Ct.App.1987), *trans. denied.* "The interest must be real, present, certain, and vested; a bias or sentiment is not sufficient to cause a witness to be incompetent." *Id.* at 558–59.

First, we address attorney Martin's testimony. Morfin essentially contends that Martin was motivated to testify against Morfin in this case in order to avoid a legal malpractice action based on his failure to explicitly state in Martinez's will that the trust for Connie and Jessica was to be funded by the Ispat Inland life insurance and pension proceeds. This plainly is a highly speculative possibility as to why Martin testified as he did regarding Morfin and his statement, in Martin's and Martinez's presence, that he would take care of Connie and Jessica if he was the beneficiary of the life insurance and pension proceeds—a possibility that is far too speculative to invoke the bar of the Dead Man's Statute. In any event, Martin's testimony was adverse to Morfin individually, not the estate in any way, shape, or form. Just because Morfin was the personal representative of the estate does not mean that an action against him, for his individual wrongdoing detrimental to the estate, was equivalent to an action against the estate itself. Accepting Martin's testimony could only have increased the estate's

assets. Martin's testimony was not barred by the Dead Man's Statute.

■ Next, we address the testimony of Fran McWhirter, Randy Martinez (Martinez's brother), and Connie Martinez (Martinez's mother). Prior to Martinez's death, he signed promissory notes in favor of McWhirter, Randy, and Connie Martinez in the amounts of $10,000, $5,000, and $5,000 respectively. Martinez executed the promissory notes instead of leaving bequests to these individuals in his will in order to avoid inheritance taxes. McWhirter, Randy, and Connie Martinez filed claims against the estate to recover on their promissory notes. Morfin contends that because they stood to recover from the estate, they were incompetent to testify under the Dead Man's Statute.

Again, however, the testimony of McWhirter, Randy, and Connie Martinez was adverse to Morfin, not to the estate. They were not testifying with respect to the validity of the promissory notes they held; they were testifying as to whether Morfin had breached a promise to take care of Connie and Jessica. That McWhirter, Randy, and Connie Martinez might have been sympathetic to Connie and Jessica or were biased in their favor was not enough to exclude their testimony under the Dead Man's Statute. *See Satterthwaite v. Estate of Satterthwaite*, 420 N.E.2d 287, 289–90 (Ind.Ct.App.1981). Additionally, as Brigham notes, the record establishes that there were more than sufficient funds in Martinez's estate to pay the promissory notes, as well as other claims and administrative expenses, including the $25,000 statutory allowance to Connie and Jessica, regardless of whether Morfin was forced to convey the life insurance and pension proceeds or their equivalent to the estate. Thus, McWhirter, Randy, and Connie Martinez all stood to collect the full value of their promissory notes, regardless of the outcome of this proceeding that was initiated for the benefit of Connie and Jessica. They would neither gain nor lose by the direct legal operation of any judgment for or against Morfin, which is a requirement for excluding testimony under the Dead Man's Statute. *See Senff*, 515 N.E.2d at 558.

This case differs from the case Morfin relies upon, *In re Estate of Lambert v. Southard*, 785 N.E.2d 1129 (Ind.Ct.App. 2003), *trans. denied*. There, a distributee of the decedent's will was left a 42½ interest in the net estate. A different distributee filed an objection to the personal representative's inventory, contending that the decedent had intended that the proceeds of a life insurance policy paid to the personal representative was to be used to pay the estate's administrative expenses. The objecting distributee sought to introduce the testimony of the other distributee with the 42½ interest to support this claim. The trial court excluded the proffered testimony under the Dead Man's Statute and we affirmed. *Id.* at 1133. We noted that use of the life insurance proceeds to pay the estate's expenses would increase the amount of assets available to the will's distributees, and thus the witness stood to gain directly from a judgment supported by his testimony. *Id.* Here, by contrast, McWhirter, Randy, and Connie Martinez had sum certain claims against the estate, and the amount they stood to collect would in no way be affected by a judgment for or against Morfin. *Lambert* does not apply here.[4]

---

4. We also note that *Lambert* failed to address whether the excluded witness's testimony was adverse to the estate.

Morfin also contends that Martinez's other brother, Tom Martinez, should have been prevented by the Dead Man's Statute from testifying. His one sentence argument on this point seems to be that because at the time he testified he had been named successor personal representative of Martinez's estate, he was incompetent to testify. It is clear and long-settled law, however, that an estate administrator is competent to testify regarding matters occurring during the decedent's life so long as such testimony is not adverse to the estate. *Bischof v. Mikels,* 147 Ind. 115, 118–19, 46 N.E. 348, 349 (1897). Tom was testifying in favor of the estate, not adverse to it, in seeking to hold Morfin liable for his misuse of the life insurance and pension proceeds. His testimony was not barred by the Dead Man's Statute.

The final witness whose testimony Morfin challenges on the grounds of the Dead Man's Statute is Maria Brigham. Except for the public record fact of her marriage to and divorce from Martinez, however, she did not testify as to any matters occurring during Martinez's life. Instead, she described what occurred after his death with respect to attempting unsuccessfully to seek assistance for Connie and Jessica from Morfin. The Dead Man's Statute applies to testimony about transactions occurring during the decedent's lifetime. *See Lambert,* 785 N.E.2d at 1132. Brigham did not testify about any such transactions and her testimony was not barred by the Dead Man's Statute.[5]

Finally, Morfin contends that any and all testimony suggesting that he improperly used the life insurance and pension proceeds for his own benefit violated the parol evidence rule because it contradicted the plain language of the forms indicating that he was the beneficiary of the pension and life insurance policies. This argument is without merit. "Parol evidence has always been held admissible in an action to establish or enforce a constructive trust." *Melloh v. Gladis,* 261 Ind. 647, 658, 309 N.E.2d 433, 440 (1974). We find no abuse of discretion in the trial court's receipt of any testimony.

## II. Waiver

Morfin also contends that Brigham, and by extension Connie and Jessica, waived any right they had to contest Morfin's status as beneficiary of the Ispat Inland five-year guaranteed pension. Specifically, Morfin notes that on November 11, 2002, Brigham signed a "Settlement Agreement and General Release" with respect to the pension. App. p. 110. The agreement addressed a QDRO claim Brigham had with respect to the pension, which provided that she was entitled to a portion of the pension based upon her previous marriage to Martinez, which ended in 1994. Essentially, the agreement splits the pension between Morfin as named beneficiary and Brigham, based on the share to which she was entitled and calculated upon the extent to which Martinez was vested at the time of their divorce. The agreement also states:

> In consideration of the above payment, Ms. Brigham on behalf of herself and the minors Connie and Jessica Martinez ... fully releases and discharges [Ispat Inland] ... from all sums of money, accounts, actions, causes of action,

---

**5.** Morfin also notes that the trial court decided to disregard the testimony of Connie and Jessica, after it had been received, on Dead Man's Statute grounds. To the extent he seems to argue prejudice as a result of the trial court's having heard the testimony before declaring it inadmissible, his argument lacks cogency. In any event, we presume that a trial court in a bench trial rendered its judgment solely on the basis of admissible evidence. *See Berry v. State,* 725 N.E.2d 939, 943 (Ind.Ct.App.2000).

claims, demands, settlement costs and attorneys fees, based upon or arising by reason of any damage, loss, injury or entitlement, regardless of source or nature, whether known or unknown, which heretofore has been or which hereafter may be suffered or sustained directly or indirectly, in consequence of, arising out of, or in any way related to those events involved in the QDRO Claim. . . .

*Id.* at 111.

 We disagree that this release barred Brigham from bringing an action against Morfin on behalf of Connie and Jessica seeking to impose a constructive trust upon the pension benefits he received. A release agreement is a species of contract that surrenders a claimant's right to prosecute a cause of action. *Dick Corp. v. Geiger*, 783 N.E.2d 368, 374 (Ind. Ct.App.2003), *trans. denied.* "Interpretation of a release, like any other contract, is determined by the terms of the particular instrument, considered in light of all facts and circumstances." *Id.* "Absent an ambiguity, release provisions are interpreted as a matter of law, and we look only to the instrument to ascertain the parties' intent." *Id.* It is axiomatic that "if the parties to the agreement intended to release only one of multiple potentially liable parties, the release does not operate to release all who are potentially liable." *Pelo v. Franklin College of Indiana*, 715 N.E.2d 365, 365 (Ind.1999).

Here, the plain language of the release unambiguously demonstrates that it only releases Ispat Inland and related parties from any liability arising from distribution of the pension benefits. Morfin himself was not released of any potential liability arising from his constructively fraudulent use of the pension proceeds. Brigham, Connie, and Jessica have not sought any recovery from Ispat Inland and the release as to Ispat Inland did not preclude an action against another potentially liable party, namely Morfin. *See id.*

### III. Sufficiency of Evidence

 Morfin also contends that there is insufficient evidence in the record to support the imposition of a constructive trust upon his assets for the benefit of Connie and Jessica. Both parties fail to acknowledge or provide us with the proper standard of review for this contention. The trial court here entered findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A) and Morfin's request. In such a case, we cannot set aside the findings or judgment unless clearly erroneous, and due regard must be given to the opportunity of the trial court to judge the credibility of the witnesses. *Steiner v. Bank One Indiana, N.A.*, 805 N.E.2d 421, 424 (Ind.Ct.App.2004) (quoting Ind. Trial Rule 52(A)). First, we must decide whether the evidence supports the findings. *Id.* Second, we determine whether the findings support the judgment, construing the findings liberally in support of the judgment. *Id.* "A judgment is clearly erroneous if it is unsupported by the findings of fact and conclusions thereon." *Id.* We do not reweigh the evidence or judge the credibility of the witnesses and consider only the evidence supporting the judgment and the reasonable inferences drawn therefrom. *Id.* Morfin's brief is unclear as to whether he is challenging the sufficiency of the evidence to support the trial court's findings, or the sufficiency of the findings to support the judgment.

 A constructive trust may be imposed where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it. *Strong v. Jackson*, 777 N.E.2d 1141, 1151 (Ind.Ct.App.2002), *aff'd on rehearing*, 781 N.E.2d 770 (Ind.Ct.App. 2003), *trans. denied.* A duty to convey the

property may arise if it was acquired through fraud, duress, undue influence or mistake, or through a breach of a fiduciary duty, or through the wrongful disposition of another's property. *Id.* The type of fraud necessary for the establishment of a constructive trust may be either actual or constructive. *See Kalwitz v. Estate of Kalwitz,* 822 N.E.2d 274, 280 (Ind.Ct.App. 2005), *trans. denied.*

A plaintiff alleging the existence of constructive fraud has the burden of proving the existence of a duty owing by the party to be charged to the complaining party due to their relationship, and the gaining of an advantage by the party to be charged with fraud. *Strong,* 777 N.E.2d at 1147. This duty may arise in one of two ways: by virtue of the existence of a fiduciary relationship, or in the case where there is a buyer and a seller, where one party may possess knowledge not possessed by the other and may thereby enjoy a position of superiority over the other. *Id.* If the plaintiff meets the burden of proof with respect to those two elements and establishes the existence of a fiduciary relationship, there is a presumption of fraud in the challenged transaction. *See id.* The burden then shifts to the defendant to prove at least one of the following by clear and unequivocal proof: that he or she made no deceptive material misrepresentations of past or existing facts or did not remain silent when a duty to speak existed, or that the complaining party did not rely on any such misrepresentation or silence, or no injury proximately resulted from the misrepresentation or silence. *Id.*

Morfin disputes the existence of a fiduciary relationship between him and Martinez. "A confidential or fiduciary relationship exists when confidence is reposed by one party in another with result-

ing superiority and influence exercised by the other." *Kalwitz,* 822 N.E.2d at 281. "The question of whether a confidential relationship exists is one of fact to be determined by the finder of fact." *Id.* The trial court here found that Morfin and Martinez "had a close, loving, and trusting relationship. Martinez had complete faith in Morfin ...." App. p. 17. It also found that as a result, "Morfin bore a fiduciary obligation to Martinez ... to direct the life insurance and pension benefits to the testamentary trust of James R. Martinez for the sole benefit of his daughters Connie and Jessica." *Id.*

There is evidence in the record to support the finding of a fiduciary relationship between Morfin and Martinez. This is partially self-evident from the fact that Martinez trusted Morfin to be the personal representative of his estate and trustee of the testamentary trust to be established for Connie and Jessica by his will. Additionally, Martinez's mother testified as to the closeness of her son and Morfin, her brother. According to her, Morfin was "very close" to acting as a surrogate father to Martinez. Tr. pp. 311–12. Morfin had helped Martinez obtain residences and several jobs, including his position at Ispat Inland. Morfin in his own testimony described himself as Martinez's "big brother" and said that Martinez "counted on me." *Id.* at 439. "[W]e will reverse a finding regarding a confidential relationship only when there is *no* evidence to support it or we reach a definite and firm conviction that a mistake has been made ...." *Kalwitz,* 822 N.E.2d at 282 (emphasis in original). There clearly is evidence in the record here that a fiduciary or confidential relationship existed between Morfin and Martinez, and that Morfin was the superior or dominant partner.[6]

---

**6.** It is also reasonable to suppose that Morfin was in an even more superior position than

The remainder of Morfin's argument is unclear. He contends, in part, that there is no evidence that he exercised undue influence upon Martinez and forced him to name Morfin as beneficiary of the life insurance and pension proceeds. This is beside the point. The trial court expressly found no evidence of undue influence in this case. Such is not required for a finding of constructive fraud, however. *Cf. Strong,* 777 N.E.2d at 1146 (holding that actual intent to defraud is not necessary to finding of constructive fraud).

Morfin also asserts, "The mere violation of an oral promise does not create a constructive trust," but also contends he never made any such "promise to use the proceeds for the benefit of Connie and Jessica Martinez." Appellant's Br. pp. 20–21. Addressing the second assertion first, it is simply an invitation to judge witness credibility or reweigh evidence, which we will not do. Martin plainly testified that Morfin said in Martin's and Martinez's presence that he would take care of Connie and Jessica if we were named the beneficiary of the life insurance policies and pension. That Morfin made such a statement at least once, and possibly more than once, is bolstered by Martinez's comments to others on several occasions that he expected Morfin to care for his daughters and the absence of any statements by Martinez that he intended for Morfin to benefit personally from the life insurance and pension proceeds.

As for Morfin's contention that an oral promise "does not create a constructive trust," this statement, while sometimes accurate, is overly broad. *Id.* at 20. Although breach of an oral promise generally will not support actual fraud actions, "such promise may form the basis of a constructive fraud action if it induces one

to place himself in a worse position than he would have been in had no promise been made and if the party making the promise derives a benefit as a result of the promise." *Strong,* 777 N.E.2d at 1149. Here, the evidence most favorable to the judgment is that in reliance upon Morfin's assurance that he would take care of Connie and Jessica if he were named beneficiary of the insurance and pension proceeds, Martinez unequivocally named him the beneficiary of the pension, and on at least one occasion (on the form that Ispat Inland acted upon) named him as beneficiary of the life insurance policy. Morfin clearly benefited as a result of his broken promise. Also, although strictly speaking Martinez himself was not placed in a worse position as a result of his action in reliance on Morfin's promise, his heirs and intended beneficiaries of the life insurance policies and pension, Connie and Jessica, were. This is sufficient to support a finding of constructive fraud. *See Melloh,* 261 Ind. at 656–59, 309 N.E.2d at 439–40 (holding imposition of constructive trust on one-half of brother's interest in decedent mother's real property for benefit of sister was "particularly appropriate" where there was evidence mother had orally stated that brother and sister should share all of her property equally, even though deed for real property listed brother as sole owner).

In sum, we reiterate that the law presumes constructive fraud once it is clear that a fiduciary or confidential relationship existed between two parties, and the dominant party gains an advantage through a transaction involving the weaker party. *See Strong,* 777 N.E.2d at 1147. Here, Brigham sufficiently proved the existence of a confidential or fiduciary relationship between Martinez and Morfin with Morfin as the dominant party. Morfin clearly gained an advantage when he

usual during the last days of Martinez's life

while he suffered from stomach cancer.

was named the direct beneficiary of the life insurance policies and pension. This was enough to presume constructive fraud. Morfin failed to rebut this presumption, as there is evidence that he made material misrepresentations to a dying Martinez regarding his intent to care for Connie and Jessica if he was left the life insurance and pension proceeds, evidence that Martinez relied on such misrepresentations, and evidence that harm to Connie and Jessica, Martinez's heirs, clearly and proximately resulted. Instead of Connie and Jessica being supported by the life insurance and pension proceeds, Morfin dissipated over $100,000 in such proceeds on himself, in clear contravention of Martinez's stated wishes. This case is a prime example of why the doctrine of constructive fraud exists—to avoid unjust enrichment. There being sufficient evidence of constructive fraud, the trial court did not err in imposing a constructive trust upon Morfin's assets in an amount equal to the life insurance and pension proceeds that he squandered. *See Strong,* 777 N.E.2d at 1151.

### Conclusion

The trial court did not abuse its discretion in its rulings regarding the Dead Man's Statute. Brigham did not waive any claim against Morfin for his misuse of the Ispat Inland pension proceeds where she settled only with Ispat Inland. Finally, the imposition of a constructive trust is clearly supported by the evidence in this case. We affirm.

Affirmed.

KIRSCH, C.J., and BAKER, J., concur.