## FOR PUBLICATION



**FILED**
Oct 27 2014, 6:07 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**EMILY C. GUENIN-HODSON**
**MARK C. GUENIN**
Guenin Law Office, P.C.
Wabash, Indiana

ATTORNEYS FOR APPELLEE:

**STEVEN L. JACKSON**
Faegre Baker Daniels LLP
Fort Wayne, Indiana

**ANNE K. RICCHIUTO**
**KATRINA M. GOSSETT**
Faegre Baker Daniels LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

RICHARD I. SPIECE SALES CO., INC.          )
d/b/a SPIECE SALES CO., INC.               )
                                           )
    Appellant-Defendant/            )
    Counterclaim Plaintiff,         )
                                           )
        vs.                  )          No. 85A02-1312-CC-1037
                                           )
LEVI STRAUSS NORTH AMERICA,                )
                                           )
    Appellee-Plaintiff/             )
    Counterclaim Defendant.         )

APPEAL FROM THE WABASH CIRCUIT COURT
The Honorable Robert R. McCallen III, Judge
Cause No. 85C01-1110-CC-829

**October 27, 2014**

**OPINION - FOR PUBLICATION**

**KIRSCH, Judge**

Following a bench trial, Richard I. Spiece Sales Co., Inc., doing business as Spiece Sales Co., Inc. ("Spiece"), appeals the trial court's judgment in favor of Levi Strauss North America ("LS & CO.") on LS & CO.'s complaint on account and on Spiece's counterclaim. On appeal, Spiece raises six issues which we consolidate and restate as whether the trial court's findings of fact and conclusions thereon, in support of LS & CO. and against Spiece, are clearly erroneous.[1]

We affirm.

## FACTS AND PROCEDURAL HISTORY

LS & CO. is an international corporation that manufactures and distributes products worldwide; the primary products at issue in this case are Levi's jeans. Spiece, a domestic corporation owned by Tom Spiece ("Tom"), is a retail operation that sells mainly sportswear and is a retail partner of LS & CO. In addition to LS & CO. products, Spiece sells products from other manufacturers, including, Lee, Dickies, Wrangler, Carhartt, Cinch, and Haggar. The instant case arises from LS & CO.'s March 2011 termination of Spiece's online sales privileges.

The parties' relationship began in 1978, when Spiece was approved to sell Levi's jeans in Spiece's two Indiana stores. LS & CO. conveyed its approval by sending Tom a letter, dated October 9, 1978 ("1978 letter"), which stated in part, "I would like to take this opportunity to welcome you as a new account of the Jeanswear Division of Levi Strauss & Co.," and reminded Tom of certain LS & CO. "policies specifically regarding account

---

[1] We commend the trial court on its detailed and thorough findings of fact and conclusions thereon, which greatly aided our appellate review.

selection and distribution." *Joint Ex*. 24 (Vol. VII).[2] During the 1980s and 1990s, Spiece made investments designed to increase its sales of Levi's jeans, including purchasing a fifty-foot-tall pair of inflatable Levi's jeans, traveling to Egypt to shoot a commercial promoting its brick and mortar stores, and staging a promotion where Tom was shot out of a canon with a pair of Levi jeans in his mouth. *Tr*. at 213-14.

LS & CO. products were sold to Spiece only on a purchase order and acceptance basis throughout the United States.[3] LS & CO.'s Terms & Conditions of Sale ("Terms of Sale") stated:[4]

> THE DELIVERY OF A PURCHASE ORDER TO LEVI STRAUSS & CO. ("LS & CO.") BY AN AUTHORIZED U.S. AND U.S. TERRITORIES RETAILER ("CUSTOMER") FOR THE PURPOSE OF PURCHASING LS & CO. PRODUCTS CREATES NO OBLIGATION ON THE PART OF LS & CO. UNLESS OR UNTIL ACCEPTED. ACCEPTANCE OF A PURCHASE ORDER IS EXPRESSLY CONDITIONAL UPON CUSTOMER'S AGREEMENT WITH THE FOLLOWING:

*J.E*. 96 (Vol. IX); *Appellee's App*. at 326.[5] The conditions described in the Terms of Sale pertained to purchase orders, product resale, shipping, claims, invoicing, and credit. Under the category "Purchase Orders," the language specifically stated, "Each shipment by LS & CO. to the Customer, whether in whole or partial fulfillment of any Customer purchase

---

[2] Joint Exhibits will hereafter be referred to as *J.E.*

[3] The trial court focused on "LS & CO.'s United States operations since it follows a different business model in international markets." *Appellant's App.* at 28.

[4] The record before us contains separate versions of the Terms of Sale for the years 2002 through 2008. Because the pertinent terms are the same in each, we cite only to the 2008 Terms of Sale. *J.E.* 96; *Appellee's App*. 324.

[5] The appellee has filed only a "supplemental appendix" with this court; for ease of reference, we cite to that document as "*Appellee's App.*"

order or related confirmation, constitutes a separate sale, obligating the Customer to pay LS & CO. for the contents of that shipment." *J.E.* 96 (Vol. IX); *Appellee's App.* at 326. The trial court found that LS & CO. accepted Spiece's purchase orders "conditioned on" Spiece: "1) compl[ying] with all applicable LS & CO. policies; and 2) paying for the products it received." *Appellant's App.* at 28.

In 2000, Spiece applied to LS & CO. for approval to sell Levi's jeans online. LS & CO. approved Spiece's request and conveyed that approval by sending a letter, dated December 5, 2000 ("2000 letter"), to Mark Campbell, Spiece's computer specialist, stating, "We are pleased to inform you that your site, www.denimexpress.com, meets our on-line selling criteria. You are now authorized to sell LS & CO. products on your web site." *J.E.* 44 (Vol. VIII). The 2000 letter also provided that, due to the Internet's dynamic nature, LS & CO. would revise its online selling policies from time to time, and that it was Spiece's responsibility to comply with the policies "to remain in good standing as an authorized on-line retailer of LS & CO. products." *Id*. Thereafter, Spiece began selling LS & CO. products through www.denimexpress.com.

After Spiece was authorized to sell LS & CO products online, it not only had to comply with the Terms of Sale, but also LS & CO's policies regarding Retail Selling on the Internet ("Internet Policies" or "RSOTI"). LS & CO.'s 2000 Internet Policies were amended in 2002, 2008, and 2010. Except as otherwise discussed below, the pertinent provisions of each of those policies remained the same. The Internet Policies contained directives aimed at protecting LS & CO.'s trademarks and restricting their overuse by LS

& CO.'s retail partners like Spiece. *Appellee's App.* at 233, 241, 301, 352. LS & CO. Internet Policies required sellers to feature brands other than LS & CO.'s brand on their websites and refrain from using LS & CO.'s logos and trademarks to imply that the site was owned or managed by LS & CO. *Id.* Again, LS & CO. reserved the right to change its policies and "to withdraw its authorization to sell online at any time." *Appellee's App.* at 236, 244, 305, 353. The trial court found that the Internet Policies, generally, "provided that LS & CO. retained the sole and exclusive right to control its customers['] use of LS & CO.'s trademark(s) as a design element on the interior and exterior of customers' store(s), on customers' Internet selling site(s) or in customers' advertising and promotional efforts." *Appellant's App.* at 30.

One of the ways that Spiece directed customers to its Denim Express website was through online marketing. Debra Nguyen, digital marketing specialist for LS & CO., testified regarding the use of "Google as a search engine and the process by which LS & CO., as well as other vendors, sell on-line." *Appellant's App.* at 30. "Google is the titan in the industry of search engines and complying with their criteria is necessary to utilize Google as a search engine. . . . LS & CO. derived great benefits from ensuring not only its compliance with Google policies, but its customers['] compliance as well." *Id.* at 30-31.

Spiece used two techniques in its marketing—paid searches, "where advertisers can . . . bid for placements" on the Internet, and a natural search technique called "key word stuffing." *Tr.* at 79, 86. Key word stuffing is done to enhance a natural search ranking through the excessive use of copy or text on a website with the goal of manipulating the

5

search engine indexing. *Id*. at 88. Key word stuffing was disfavored by Google, who often punished those engaged in that practice. *Id*. at 86.

In 2008, LS & CO.'s Internet Policies included a new section addressing "Digital Marketing," which prohibited retail partners from engaging in key word stuffing and bidding on Levi's trademark terms (such as Levi's® and 501®) as part of a paid search. *Tr*. at 107-08; *Appellee's App*. at 303-04. LS & CO. placed no restrictions on a retailer's ability to buy non-trademarked terms (such as denim or jeans) to use in online ads. *Tr*. at 108-09.

On June 20, 2008, Laura Castellanos (the LS & CO. salesperson for Spiece's account) sent an email to Campbell informing him that Spiece was in violation of the 2008 Internet Policies. Castellanos attached to the email a copy of the 2008 Internet Policies "with highlighted captions of the areas [LS & CO.] ha[d] identified in violation." *J.E.* 94 (Vol. IX). Through this, LS & CO. notified Spiece that it was in violation of those policies. Spiece remedied some of the violations, but on September 9, 2008, the Vice President of Levi.com took screenshots of Denim Express's website to illustrate how Spiece still had violations pertaining to paid searches and key word stuffing. *J.E.* 97 (Vol. IX).

In May 2010, Spiece's owner, Tom, emailed a Senior Sales Director at LS & CO. to complain about the prohibition on Spiece being able to purchase LS & CO.'s trademarks as paid search terms. *Appellee's App*. at 355. By late 2010, Spiece had fallen behind on its inventory payments to LS & CO. and remained that way through and after its eventual termination. *Appellee's App*. at 361-80. LS & CO. continued to document violations of

the Internet Policies through early 2011, by which time Tom had explicitly informed LS & CO. representatives that he "would not comply" with the Internet Policies. *Tr.* at 520; *J.E.* 131 (Vol. X).

In mid-March 2011, Spiece received written and oral notice that its authorization to sell LS & CO. products online had been revoked. *Tr.* at 588; *Appellant's App.* at 57; *Appellee's App.* at 161. Because Spiece had made a large purchase at the end of 2010, LS & CO. informed Spiece it would consider a one-time return of that merchandise. *Tr.* at 590-92; *Appellee's App.* at 384. Such offer was dependent on Spiece providing LS & CO. with a detailed list of inventory so that LS & CO. could place a monetary value on the return. *Tr.* at 591; *Appellee's App.* at 384. Spiece never provided that detailed inventory; instead, it kept the merchandise, but paid for only part of it. *Tr.* at 591-92; *Appellant's App.* at 384. In April 2011, one week after issuing the inventory return offer to Spiece, LS & CO. contacted Spiece about its still-outstanding balance and warned that if Spiece continued to refuse to pay, LS & CO. would begin a formal collection process. *Id.* at 156-57. Spiece's account was ultimately referred to collections, resulting in this lawsuit. *Id.* at 403.

On August 4, 2011, LS & CO. filed a complaint on account, claiming that Spiece owed LS & CO. $321,778.48 for goods and services supplied to Spiece, but for which Spiece had not paid. Spiece filed its answer and affirmative defenses. Seven months later, Spiece filed an eight-count counterclaim alleging that LS & CO. had: (1) breached its contract with Spiece; (2) breached its implied warranty of merchantability; (3) violated

Indiana's Deceptive Franchise Practices Act ("Franchise Act"); (4) committed fraud; (5) committed constructive fraud; (6) committed tortious interference with Spiece's contractual rights and wrongfully converted Spiece's Internet business; (7) breached a fiduciary duty; and (8) violated consumer trade regulations. *Appellee's App*. at 105-11.

The trial court held a four-day bench trial from August 13 through August 16, 2013. Evidence was introduced at trial regarding the relationship between Spiece and LS & CO. Evidence was also introduced regarding the Terms of Sale and the Internet Policies, and Spiece's compliance therewith. Tom testified that he "pursue[d] opportunities aggressively" and would "try to do anything to maximize getting people to [his] site." *Tr*. at 465. Despite this claim, Tom testified that he followed the Internet Policies "[t]o the best of [his] knowledge," because failure to comply would result in Tom losing payments from LS & CO.'s Promotional Incentive Fund; additionally, Tom did not "want [LS & CO.] to threaten to take away the [product] line." *Id*. at 384. Tom also admitted that, as of that date, LS & CO.'s products still remained on Spiece's website, denimexpress.com; this was almost two-and-a-half years after LS & CO. had terminated Spiece's online selling privileges. *Id*. at 469.

On September 16, 2013, both parties filed proposed findings of fact and conclusions thereon. *Appellee's App*. at 1, 133. On November 25, 2013, the trial court issued its own written findings of fact and conclusions thereon, into which it incorporated by reference LS & CO.'s proposed findings and conclusions thereon ("LS & CO.'s findings"). The trial court qualified that it was not adopting LS & CO.'s findings regarding damages. The trial

8

court was, however, adopting LS & CO.'s findings to the extent they were not inconsistent with the trial court's own findings and conclusions. *Appellant's App.* at 37. The trial court concluded, "Spiece has failed to carry its burden of proof on each of its counterclaims and shall take nothing by way of those counterclaims against LS & CO," and further held, "LS & CO. shall have and recover from Spiece the principal sum of $315,076.24,[6] together with costs and post-judgment interest hereafter as provided by law." *Appellant's App.* at 37. Spiece now appeals, contending that the trial court's judgment is clearly erroneous as to its findings in favor of LS & CO. on its complaint on account; and against Spiece on its counterclaims for breach of contract; constructive fraud; and violating the Franchise Act.[7]

## DISCUSSION AND DECISION

Pursuant to LS & CO.'s written request, the trial court entered findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52. On appeal of claims tried by the trial court without a jury, the appellate court shall not set aside findings or judgment unless clearly erroneous. *Kesler v. Marshall*, 792 N.E.2d 893, 895 (Ind. Ct. App. 2003), *trans. denied.* First, we consider whether the evidence supports the findings, construing the findings liberally in support of the judgment. *Id.* Next, we determine whether the findings support the judgment. *Id.* A judgment is clearly erroneous when it is unsupported by the

---

[6] In its complaint on account, LS & CO. originally requested $321,778.48. However, as reflected in the trial court's order, an offset of $6,702.24, which was agreed to by the parties, reduced the original amount to $315,076.24.

[7] Spiece does not appeal the trial courts determination in favor of LS & CO. on Spiece's claims that LS & CO.: (1) breached its implied warranty of merchantability; (2) committed fraud; (3) committed tortious interference with Spiece's contractual rights and wrongfully converted Spiece's Internet business; (4) breached a fiduciary duty; and (5) violated consumer trade regulations.

9

findings of fact and conclusions thereon. *Id.* In applying this standard, we will neither reweigh the evidence nor judge the credibility of the witnesses. *Id.* at 895-96. Rather, we consider the evidence that supports the judgment and the reasonable inferences to be drawn therefrom. *Id.* at 896. We must affirm the judgment of the trial court unless the evidence points incontrovertibly to an opposite conclusion. *Id.*

Spiece criticizes the trial court's "whole cloth adoption" of LS & CO.'s findings. *Appellant's Br*. at 2. Citing to *Dallas v. Cessna*, 968 N.E.2d 291 (Ind. Ct. App. 2012), Spiece maintains that the approach of adopting wholesale one party's proposed findings and conclusions "gives cause for concern and reason for closer appellate scrutiny." *Appellant's Br*. at 2. In *Dallas*, our court noted that a trial court's verbatim adoption of one party's proposed findings and conclusions, while not prohibited, is discouraged and justifies "cautious appellate scrutiny." *Dallas*, 968 N.E.2d at 296.

The instant case is distinguishable. Here, the trial court did not merely adopt LS & CO.'s findings verbatim; instead it drafted its own twelve-page order and, as part of that order, adopted LS & CO.'s findings to the extent "they are not inconsistent with [the trial court's] findings of fact and conclusions [thereon]." *Appellant's App.* at 37. In that adoption, the trial court specifically stated, LS & CO.'s findings, "with the exception(s) noted above, accurately reflect the facts and law the court has concluded are appropriate." *Id*. at 37 n.6.

Spiece contends that the trial court's findings and conclusions and judgment in favor of LS & CO. and against Spiece are clearly erroneous with respect to LS & CO.'s complaint

on account and Spiece's counterclaims for breach of contract, constructive fraud, and violating the Franchise Act. Spiece appeals from an adverse judgment with respect to LS & CO.'s complaint on account, and from a negative judgment with respect to its counterclaims against LS & CO. "'A negative judgment is one that was entered against a party bearing the burden of proof; an adverse judgment is one that was entered against a party defending on a given question[.]'" *Kotsopoulos v. Peters Broad. Eng'g, Inc.*, 962 N.E.2d 97, 105 (Ind. Ct. App. 2011) (quoting *Romine v. Gagle,* 782 N.E.2d 369, 376 (Ind. Ct. App. 2003, *trans. denied*)).

## I.      Complaint on Account

Spiece argues that the trial court's findings of fact are not sufficient to support the trial court's judgment that "LS & CO. shall have and recover from Spiece the principal sum of $315,076.24, together with costs and post-judgment interest hereafter as provided by law." *Appellant's App.* at 37. As to the complaint on account, Spiece is appealing an adverse judgment. When a trial court enters findings of fact in favor of the party bearing the burden proof, we will deem the findings to be clearly erroneous where they are not supported by substantial evidence of probative value. *Kotsopoulos,* 962 N.E.2d at 105 (citing *Garling v. Ind. Dep't of Natural Res.,* 766 N.E.2d 409, 411 (Ind. Ct. App. 2002), *trans. denied*). Moreover, we will reverse the judgment even where we find substantial supporting evidence, if we have a definite and firm conviction that a mistake was made. *Id.*

11

Spiece does not contest that it owed LS & CO. for shipments of apparel; instead, Spiece argues that LS & CO. did not carry its burden of proving "with specificity the amount claimed on the account." *Appellant's Br*. at 19. In support of its argument, Spiece cites to discrepancies in the amounts LS & CO. claimed Spiece owed. In the complaint on account, LS & CO. claimed Spiece owed $321,778.48. *Tr*. at 681. At trial, however, LS & CO.'s expert witness, Vincent Thomas, testified that the amount owed was $371,778.48. *Id*. at 653. Thomas testified that he initially understood the debt to be $321,778.48 because he based that amount on the affidavit of debt executed under oath by LS & CO.'s employee, Michael Stapleton. *Id*. at 644. Spiece contends that LS & CO. was aware "that the amount of debt they were claiming fluctuated significantly and that the Affidavit of Debt attested to by Michael Stapleton was wrong." *Appellant's Br*. at 20.

During trial, the judge expressed frustration regarding discrepancies in the evidence as to the amount of debt owed for the complaint on account and stated that he would be unable to make a decision based on the evidence before him. *Tr*. at 54-56. Therefore, at LS & CO.'s request, the trial court allowed Tom to take the stand to testify on this issue. *Id*. at 56. Tom stated that he was the owner of Spiece and admitted that he had previously given a deposition in connection with this case. LS & CO. asked Tom, "Do you recall being asked to admit that [Spiece] owed three hundred and twenty-one thousand, seven hundred seventy-eight dollars, and forty-eight cents on invoices that had not been paid." *Id*. at 58. Tom responded that it had been over a year ago and said, "I remember admitting that I felt the number was correct. I'm not sure if I can remember if that was the number."

12

*Id.* To refresh Tom's recollection, LS & CO. referred specifically to Question 49, found on pages eleven and twelve of his April 13, 2012 deposition. There, Tom had been asked:

> In that complaint [LS & CO.] claimed that you owed them a principal sum of three hundred twenty one thousand seven hundred seventy eight dollars and forty eight cents. And here's a copy of it if you haven't looked at it in a while. Is that – Do you agree with that dollar figure or [disagree] with that dollar figure?

*Appellee's App.* at 465-66. After refreshing Tom's recollection, LS & CO. questioned whether Tom recalled answering in his deposition, "I would agree with that dollar figure being the amount that was owed by me on invoices that I had not paid." *Tr.* at 59. Tom agreed, "Yes, I think that was—that answer." *Id.* The trial court interjected to confirm that the previous testimony, *i.e.,* Tom's agreement that he owed $321,778.48, was a "correct recitation [of] what [his] answer was on that day in the deposition." *Id.* at 59. Tom replied, "If that's how it is recorded, yes, I would agree that would be what I said." *Id.*

LS & CO. further questioned whether Tom remembered being questioned during the deposition about "an offset for some merchandise that [Tom] said was defective." *Id.* at 59. Tom agreed that he remembered that he submitted a dollar amount of $6,702.24, an amount that was negotiated by the parties. *Id.* at 59-60. The trial court calculated the difference between the $321,778.48 that Tom agreed Spiece owed and the offset of $6,702.24, and ordered Spiece to pay "$315,076.24, together with costs and post-judgment interest hereafter as provided by law." *Appellant's App.* at 37. The trial court's decision on the amount awarded to LS & CO. on its complaint on account was supported by substantial evidence of probative value.

## II.    Counterclaims

Spiece next contends that the trial court erred in concluding that Spiece failed to carry its burden of proof on its counterclaims for breach of contract, constructive fraud, and violating the Franchise Act. Spiece maintains that the general ruling by the court was not sufficient to support the denial of Spiece's counterclaims. Spiece had the burden of proof on its counterclaims; therefore, as to these issues, Spiece appeals from a negative judgment. A party appealing from a negative judgment must show that the evidence points unerringly to a conclusion different than that reached by the trial court. *Kotsopoulos*, 962 N.E.2d at 105 (citing *Mominee v. King,* 629 N.E.2d 1280, 1282 (Ind. Ct. App. 1994)). We will reverse a negative judgment only if the undisputed evidence and all reasonable inferences to be drawn from that evidence lead to but one conclusion, and the trial court has reached a different conclusion. *Id.*

### A.    *Breach of Contract*[8]

To prove breach of contract, Spiece, as the party with the burden of proof, was required to prove:  1) the existence of a contract; 2) a breach of that contract; and 3) that damages arose from that breach of contract. Here, Spiece applied for and was granted the

---

[8] We recognize that a purchase order can, indeed, be a separate contract. *See Berkel & Co. Contractors v. Palm & Assocs., Inc.*, 814 N.E.2d 649, 656 (Ind. Ct. App. 2004) (purchase order that called for surveying services to stake approximately 800 auger pilings to be paid at a rate of $110 per hour, was reasonably definite in its terms and, thus, was valid, enforceable contract). Spiece, however, makes no claim that LS & CO. violated any of the separate purchase orders. Instead, he contends that the 1978 letter and the 2000 letter constituted a contract that LS & CO. violated when it terminated Spiece's privileges to sell Levi products online.

right to sell LS & CO. products in its brick and mortar stores in 1978, and online in 2000. LS & CO. drafted letters that reflected Spiece's authorization to sell LS & CO.'s products. *Appellant's Br*. at 6. Spiece maintains that these were letter agreements and therefore confirmed the existence of a contract.[9] *Id*. (citing *Indianapolis City Mkt. Corp. v. MAV, Inc*., 915 N.E.2d 1013, 1023 (Ind. Ct. App. 2009) (parties entered into a letter-agreement that expressed the intent of both parties)). The trial court, however, concluded that LS & CO. sold to Spiece only on a purchase order and acceptance basis. LS & CO. could control to whom they sold and pursuant to what terms. Spiece and LS & CO. had no on-going obligation to each other to continue their relationship. Upon acceptance of a purchase order from Spiece, LS & CO.'s sole obligation was to deliver that order to Spiece. Spiece, in turn, was obligated to pay LS & CO. for the product(s) purchased.

This determination was supported by the following findings:

302. [LS & CO.] had only a purchase order and acceptance relationship with Spiece. No long-term supply contract existed between them.
303. The relationship between [LS & CO.] and Spiece was voluntary and at-will.
304. Spiece had no obligation to buy from [LS & CO].
305. [LS & CO.] had no obligation to sell any quantity of products other than those identified in accepted purchase orders.
306. Each purchase order is a separate agreement. *See J.E.* 96 (LS2072-75) (2008 Terms and Conditions of Sales) ("Each shipment by LS & CO. to the Customer, whether in whole or partial fulfillment of any Customer purchase order or related confirmation, constitutes a separate sale, obligating the Customer to pay LS & CO. for the contents of that shipment.")

---

[9] As proof of the existence of a contract, in its brief, Spiece also cites to numerous communications in which LS & CO. thanked Spiece for their partnership and support of LS & CO.'s brands. LS & CO. stated, "[W]e value our relationship with you and look forward to continuing to work with your company in the future." *Appellant's Br*. at 6-7 (citing *Appellant's App.* at 65, 66, 67-68). Notwithstanding these comments, Spiece has failed to argue how these statements constitute a contract.

307. Because of this separation, the purchase orders do not contain an option to renew.

308. [LS & CO.]'s business model authorizes retail buyers to submit orders for inventory, and [LS & CO.] fills those orders at its discretion and only if the buyers are in compliance with applicable policies.

309. The 1978 and 2000 welcome letters did not constitute "letter agreements." *J.E.* 24, *J.E.* 44.

. . . .

311. [LS & CO.]'s unilateral policies, such as RSOTI, are not contracts.

312. The policies themselves make clear that if they are violated, [LS & CO.] may choose to revoke a buyer's ordering privileges. *J.E.* 113 (LS 2042-48); *J.E.* 95 (LS. 1982); *J.E.* 90 (LS 2014).

313. [LS & CO.] had two distinct grounds for discontinuing sales to Spiece: noncompliance with policies and nonpayment. . . .

314, [LS & CO.] was not required to provide any specific notice to Spiece before ending the parties' relationship.

315. Spiece failed to meet its burden of proof as to [the breach of contract count].

*Appellee's App*. at 33-34.

Spiece was given authorization to sell LS & CO.'s products online. Spiece obtained LS & CO. products by means of individual purchase orders. LS & CO. accepted Spiece's purchase orders "conditioned on" Spiece: "1) complying with all applicable LS & CO. policies; and 2) paying for the products it received." *Appellant's App*. at 28. Here, Spiece did not comply with either condition. On appeal, Spiece uses eight pages of its brief to discuss how LS & CO. breached its contract with Spiece and what damages resulted from that breach. We need not address those issues where, like here, the trial court concluded that no contract existed between Spiece and LS & CO. In the present case, the evidence supports the findings, and the findings support the judgment. The trial court's decision is not contrary to law; therefore, we affirm its judgment on this issue.

16

## B. Constructive Fraud

Spiece argues that the evidence at trial demonstrated that the essential elements of constructive fraud were satisfied. A plaintiff, like Spiece, who alleges the existence of constructive fraud has the burden of proving the existence of a duty that is owed to that plaintiff by the party to be charged due to their relationship, and the gaining of an advantage by the party to be charged with fraud. *Morfin v. Estate of Martinez*, 831 N.E.2d 791, 802 (Ind. Ct. App. 2005). Spiece suggests that LS & CO. owed Spiece a duty that arose out of the relationship forged by the 1978 and 2000 letters, as well as from LS & CO.'s representations of their "partnership."[10] *Appellant's Br*. at 16. The trial court heard four days of evidence. During trial, Tom testified that he had owned Spiece for thirty-eight years, had graduated from DePauw University, and had attended Harvard Business School. *Tr*. at 367. Tom testified that Spiece's relationship with LS & CO. was voluntary; LS & CO. was not obligated to sell to Spiece, and Spiece was not obligated to buy from LS & CO. *Id*. at 460-61. The Terms of Sale provided that the delivery of a retailer's purchase order to LS & CO. "for the purpose of purchasing LS & CO. products creates no obligation on the part of LS & CO. unless or until accepted"; furthermore, "Each shipment by LS & CO. to the Customer, whether in whole or in partial fulfillment of any Customer purchase order or related confirmation, constitutes a separate sale . . . ." *Appellee's App*. at 326.

---

[10] Spiece maintains that, "'[u]nder common law, general partners owe each other and the partnership fiduciary duties until final termination of the partnership. This fiduciary relationship between partners requires each partner to exercise good faith and fair dealing in partnerships transactions toward co-partners.'" *Appellant's Br*. at 16. (quoting *In re Rueth Dev. Co.*, 976 N.E.2d 42, 53 (Ind. Ct. App. 2012), (internal citation omitted) (emphasis deleted), *trans. denied*. Spiece, however, provides no real evidence of the existence of a partnership.

Tom testified that he followed the Internet Policies to the best of his knowledge because he understood that to do otherwise would risk LS & CO.'s taking away LS & CO. product. *Tr*. at 384.

The trial court concluded that "[t]here was no fiduciary relationship between the parties," and that "[t]he parties' relationship consisted of a series of arm[']s length commercial purchase transactions between a buyer and seller." *Appellee's App*. at 43. Accordingly, LS & CO. could not be liable for breaching a fiduciary duty where none existed. *Id.* The trial court concluded that, without a fiduciary duty, between the parties, Spiece's constructive fraud claim fails. Here, the evidence supports the findings, and the findings support the judgment. The trial court's decision is not contrary to law; therefore, we affirm its judgment on this issue.

### C.     *Deceptive Franchise Practices Act*

Finally, Spiece argues that the trial court erred in determining that Spiece was neither a franchisee nor protected by the Franchise Act. Spiece contends that, pursuant to the definition set forth in [Indiana Code section] 23-2-2.5-1, Spiece is a franchisee of LS & CO. That section provides:

> (a) "Franchise" means a *contract* by which:
>
> (1) a franchisee is granted the right to engage in the business of dispensing goods or services, under a marketing plan or system prescribed in substantial part by a franchisor;
> (2) the operation of the franchisee's business pursuant to such a plan is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate; and

18

(3) the person granted the right to engage in this business is required to pay a franchise fee.

Ind. Code § 23-2-2.5-1(a) (emphasis added).

In its Order, the trial court found:

LS & CO. has no franchises in the United States, Spiece's claim to the contrary notwithstanding. Significantly, Spiece's claim that [it] was a franchisee of LS & CO. was based, at least in part, upon a document Tom referred to as a Trading Partner Agreement. However, Spiece produced no such document. The Court notes the exhibits submitted during trial were voluminous. No stones were left unturned by either side. Pursuant to Indiana Trial Rule 9.2, Spiece has the burden of pleading and proving the existence of such document. Spiece did not meet this burden.

. . . .

Spiece meets none of the[] criteria [for being a franchisee]. LS & CO. had no control over who Spiece hired or what it sold to its customers. While LS & CO. would, from time to time, offer Spiece the opportunity to purchase new products to sell to customers, it did not require that Spiece do so. Any promotional materials that LS & CO. encouraged, such as seasonal point of sale promotional materials, were provided by LS & CO. at no cost to Spiece. Spiece was not required to adhere to any marketing plan. LS & CO. did not control the pricing Spiece offered to its customers. While LS & CO. published suggested minimum advertised prices, it had no mandatory pricing rules and Spiece was free to deviate from those suggestions. Spiece is not a franchisee of LS & CO.

*Appellant's App.* at 32-33.

Spiece disputes the trial court's findings, specifically the finding that Spiece was not required to adhere to any marketing plan. Spiece maintains that it did indeed "enter[] into contracts for the dispensing of goods under a marketing plan prescribed in substantial part by the franchisor, Levi." *Appellant's Br*. at 22. As support, Spiece highlights the testimony of two LS & CO. employees, who testified that retailers had to comply with LS

19

& CO.'s terms and conditions that "include[d] various marketing plans," and that LS & CO. had "marketing requirements" and "advertising had to be approved by [them]." *Tr*. at 528, 597. David Shankle, Spiece's menswear buyer, testified that Spiece had to comply with LS & CO.'s pricing structure or it would forfeit payments from LS & CO.'s Promotional Incentive Fund. Spiece cites to this testimony as proof that LS & CO. exercised control over the pricing of Levi products," which is a fundamental aspect of a marketing plan. *Appellant's Br*. at 22 (citing *Tr*. at 189).

Evidence before the trial court revealed that LS & CO. did not require Spiece to advertise Levi jeans by having a pair of fifty-foot-tall jeans on its building, by having Tom shot out of a canon with a pair of jeans in his mouth, or by going to Egypt to film a commercial. *Tr*. at 222. Spiece was not required to buy products from LS & CO, and LS & CO. was not obligated to sell to Spiece. *Id*. at 460. Additionally, while LS & CO. provided Spiece with a suggested retail price, Spiece was not required to use that price.[11] Finally, Tom asserted that Spiece had a marketing plan, but conceded that this was a verbal and mutually agreed upon plan and, therefore, was not a signed document. *Id*. at 459-60.

Spiece's argument that it is a franchisee subject to the Franchise Act is merely a request for this court to reweigh the evidence and reassess witness credibility in its favor, which we may not do. *In re Estate of Holt*, 870 N.E.2d 511, 515 (Ind. Ct. App. 2007), *trans. denied*. The trial court, as the trier of fact, was empowered to weigh the evidence

---

[11] LS & CO. did not require Spiece to sell Levi jeans at a specific price; however, it did provide incentive for retailers to follow the suggested prices by providing payments from its Promotional Incentive Fund for those that complied. *Tr*. at 189.

and credibility of witnesses in order to determine the facts, and to render judgment accordingly. Based upon our review of the record before us, we are not left with a firm conviction that a mistake was made.

Affirmed. [12]

BAKER, J., and ROBB, J., concur.

---

[12] Spiece also contends that the trial court abused its discretion: (1) when it incorporated by reference into the trial court's findings the opinion of LS & CO.'s expert Vincent Thomas, who testified regarding damages that arose from the breach of contract; and (2) by denying Spiece's request to admit Joint Exhibit 265, which was a copy of emails pertaining to whether Spiece's compliance, or lack thereof, with RSOTI was sufficient to terminate the contract. Finding, as we do, that Spiece did not meet its burden of proving that a contract existed between Spiece and LS & CO., we need not address these issues.