## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 11 2018, 9:00 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Joel M. Schumm
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Jenny R. Buchheit
Gregory W. Pottorff
Ice Miller LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Civil Commitment of: | May 11, 2018 |
| D.W., | Court of Appeals Case No. 49A02-1710-MH-2343 |
| *Appellant-Respondent*, | Appeal from the Marion Superior Court |
| v. | The Honorable Steven R. Eichholtz, Judge |
| Indiana University Health Methodist, | Trial Court Cause No. 49D08-1709-MH-34676 |
| *Appellee-Petitioner*. | |

**Brown, Judge.**

[1] D.W. appeals the trial court's September 22, 2017 Order of Regular Commitment of D.W. We affirm.

*Facts and Procedural History*

[2] On September 12, 2017, Indiana University Health Methodist ("Methodist") filed a petition for involuntary commitment of D.W. which alleged that D.W. was born in June of 1958, is suffering from a psychiatric disorder, and is gravely disabled. The petition listed the following tasks which D.W. does not perform independently: "attend treatment (ECT. Outpatient therapy)," "comply with medication regimen," and "take care of self and ADLs, daily functioning." Appellant's Appendix Volume II at 13. A physician's statement by Dr. Michael Metrick dated September 12, 2017, was also filed in which Dr. Metrick stated that he examined D.W. on that date and that in his opinion she is suffering from schizoaffective disorder with recurring catatonia, is gravely disabled, and is in need of custody, care, or treatment in an appropriate facility. On September 21, 2017, the court held a commitment hearing at which it heard testimony from Dr. Metrick and Erin Robertson, who worked for The Center for At-Risk Elders ("CARE") which provided services for D.W.

[3] On September 22, 2017, the court issued an Order of Regular Commitment stating that it found, by clear and convincing evidence, that D.W. "is suffering from a psychiatric disorder, specifically schizoaffective disorder with recurrent catatonia, which is a mental illness," is "gravely disabled, as defined in I.C. 12-7-2-96," and "is in need of custody, care, and treatment at Indiana University

Health Methodist, Psychiatry / Behavioral Health Unit for a period expected to exceed ninety (90) days." *Id*. at 9. The court ordered that D.W. be committed to the designated facility until discharged or until the court terminates the commitment and that the facility submit a periodic report no later than September 21, 2018, at which time the treatment plan will be reevaluated.

## *Discussion*

[4] D.W. requests that this Court vacate her involuntary commitment and argues that the trial court's decision is not supported by sufficient clear and convincing evidence of grave disability. In order for a trial court to order a regular commitment, there must be clear and convincing evidence that an individual is: (1) mentally ill; and (2) either dangerous or gravely disabled. *T.D. v. Eskenazi Health Midtown Cmty. Mental Health Ctr.*, 40 N.E.3d 507, 510 (Ind. Ct. App. 2015) (citing Ind. Code § 12-26-7-1); Ind. Code § 12-26-2-5(e) (setting forth the clear and convincing standard). The clear and convincing evidence standard is an intermediate standard of proof greater than a preponderance of the evidence and less than proof beyond a reasonable doubt. *T.D.*, 40 N.E.3d at 510. In order to be clear and convincing, the existence of a fact must be highly probable. *Id.* In reviewing the sufficiency of the evidence, we will consider only the evidence favorable to the judgment and the reasonable inferences supporting the judgment, and we will not reweigh the evidence or assess the credibility of witnesses. *Id*.

[5]   D.W. does not challenge the trial court's finding that she is mentally ill. Instead, she argues that the evidence does not support the court's determination that she is "gravely disabled." Ind. Code § 12-7-2-96 provides:

> "Gravely disabled", for purposes of IC 12-26, means a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:
>
>> (1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or
>>
>> (2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

The statutory language looks to the patient's behavior at the time of the hearings, not to the patient's history. *See Commitment of M.E. v. Dep't of Veterans Affairs*, 64 N.E.3d 855, 863 (Ind. Ct. App. 2016).

[6]   D.W. argues that the trial court's finding that she is gravely disabled is not supported by the requisite proof of clear and convincing evidence. She argues there is no evidence that she was in danger of coming to harm at the time of the hearing because of an inability to provide food or shelter, and that Dr. Metrick testified she was not malnourished and had been living on her own in an apartment for at least a few months before her hospitalization. She also contends that she was not at risk of coming to harm because of any impairment or deterioration of judgment or behavior and was sufficiently capable of functioning independently.

[7]     Methodist responds that D.W.'s arguments that she can provide herself with food and shelter amount to a request to reweigh the evidence. It states that Dr. Metrick explained that D.W. is unable to meet her essential human needs when her catatonia takes hold and there was a rapid increase in recurrence of symptoms and decompensation after D.W. transferred to an apartment, that Robertson confirmed that D.W. can feed herself appropriately when hospitalized, and that there was no evidence D.W. can provide herself with food when she is not medicated. It argues that Dr. Metrick testified and Robertson confirmed that D.W. will not take her medication without supervision, that Dr. Metrick noted that D.W.'s recurrent hospitalization was occasioned in part by her non-adherence to treatment, that Dr. Metrick testified that, without treatment, catatonia can be a terminal condition, and that Robertson testified that D.W. was not functioning independently at the time of the hearing.

[8]     At the commitment hearing, Dr. Metrick testified that he is a staff psychiatrist with Methodist and his opinion of D.W.'s condition has not changed since he filed his physician's statement. He testified that D.W. "was referred to us from another hospital where she was taken secondary to decompensation for her mental concerns," "[t]here was concern regarding recurrence of catatonia and some worry about suicideality," "Community Hospital has assessed her, knew our familiarity with her and asked if we would be willing to hospitalize her," "[w]e've had [D.W.] under our care periodically over the last year and a half," "[s]pecifically in the last year alone, from September 2016 to know [sic] this is

the fifth in-patient hospitalization we've had with her and we've cared for her," and "I have personally been involved with those admissions as well." Transcript Volume II at 7. He estimated that he examined D.W. ten to twelve times during the latest admission, and stated that a temporary civil commitment had been granted in September 2016.

[9] Dr. Metrick testified that D.W.'s condition is consistent with schizoaffective disorder, which has been her long-term diagnosis, that "she carries a very specific sub-set of symptoms that we term catatonia," and that schizoaffective disorder with recurrent catatonia is a mental illness. *Id*. at 8. When asked to explain the reason for his diagnosis, Dr. Metrick testified:

> It's the catatonia portion that has been most prominent and the one that we have observed most first-hand. When [D.W.] has fallen ill, she has exhibited a multitude of features. Most of it is extreme negativism. That includes basic difficulties communicating her needs, her caring for herself, prolonged periods of immobility and lack of speech. Inability to attend to ADL's. Severe brakenesia; slow movements. The admission just prior to this, there has been a duration of immobility for nearly a full day and emergency services were called to her aid at that point in time. The basic difference[s] include difficulty feeding self, caring for herself. Thought blocking where there's a significant poverty of content and difficulty, you know, engaging in any type of dialogue.

*Id*. at 8-9. He indicated that D.W.'s lack of insight with regard to catatonia is one of the reasons for the recurrence of her in-patient stays.

When asked if D.W. is unable to provide herself with essential human needs such as food, clothing, shelter, Dr. Metrick testified:

> She requires assistance with those, essentially with – when we first were made familiar with her she was living independently and had an apartment. But unfortunately, over the last year and a half, with these recurrent bouts of catatonia she did lose that apartment ultimately and needed to be placed in a nursing facility. A skilled nursing facility where she has a period of time of doing a little bit better with some recurrence. Since transitioning out, she has had the CARE organization advocating for her and assisting her getting back into some sort of apartment situation. Over the last few months unfortunately, we've seen a rapid increase in recurrence of symptoms and decompensation since being back in an apartment. She has required definitely supervision with those basic daily needs, including medication.

*Id.* at 10. When asked if D.W. has "any difficulty feeding herself appropriately at this time," he answered "[w]e've observed that – well, I would not say today, no. But when – during the highest impairment points certainly." *Id.* When asked "is she unable to meet those needs as a result of her mental illness," he replied "[y]es, when catatonia takes a hold, certainly she would be unable to meet those needs." *Id.* at 11.

When asked "does [D.W.] also suffer substantial impairment or obvious deterioration of her judgment, reasoning or behavior that results in her inability to function independently," Dr. Metrick replied "Yes. And with the catatonia, it is very difficult to have any conversation regarding treatment or needs. And at that point in time, the capacity for informed decision making is certainly lost. Necessitating historically of course, the previous commitment and the

appointment of a guardian." *Id.* He indicated that D.W.'s mental illness affects her ability to take her medications. He also testified that, based on his treatment of D.W., she is gravely disabled. Dr. Metrick further testified "we have not experienced any direct self-threats or any violent behaviors," "[o]ur primary concern is for safety towards herself is a more indirect effect of decompensation," "[c]atatonia in its most extreme form is also – can become what we call malignant or lethal catatonia requiring even ICU stays," "[o]ur idea is to maintain enough stability to prevent that from occurring," and "without treatment, it can be actually a terminal condition." *Id.* at 11-12.

[12]     Dr. Metrick further testified "[a]lternate plans have unfortunately failed to maintain stability including a previous temporary commitment, and appointment of guardianship," "[w]e continue to find barriers and get lapses in treatment that have led to chronic recurrence of the illness," "[w]e believe that she needs a long maintenance plan," and "[w]e are considering a long-term plan, either in some structured environment with staff supervision and even state hospital is being considered." *Id.* at 12. When asked if D.W. responded well to the medications when taken, Dr. Metrick replied "[y]es, we see a dramatic improvement." *Id.* at 14. When asked if he believed D.W. can be relied upon to take her medications without supervision, he responded "[n]o, at this point she will take them with supervision, but unfortunately her recurrence of hospitalization has been led to partly by non-adherence with treatment." *Id.* He stated:

[D.W.'s] prognosis is . . . good. We've seen a quite a big improvement with [D.W]. Prior to the last year and a half. When she was able to work independently. Or live independently, I'm sorry. She used to be employed at one point in the past. We do see a big change in her when she gets treatment regularly. Unfortunately, we think that there is enough gaps in the treatment that the back slide prevents maintaining that stability. Our hope is with more stabilized treatment she will restore well and be able to return to independent living and function well.

*Id.* at 16. He testified that her prognosis without treatment is very poor.

[13]     On cross-examination, when asked if D.W. improved during the last one and one-half years, Dr. Metrick answered "[w]ell . . . it's been up and down. She's better today than when she came into the hospital, but with each admission she ends up back where we started. So it's definitely been a sawtooth." *Id.* at 18. He indicated that D.W. was not malnourished. When asked "and since she has been on the unit she has been eating," he answered "[s]he has . . . it's always slow at the beginning but it does improve as her treatment takes hold." *Id.* at 20.

[14]     Robertson testified that she is a client advocate for CARE and she discusses medical care with physicians, arranges appointments and transportation, and sets up services in the community. She indicated that her relationship to D.W. is that she is "her team lead," that the role is similar to a guardian, and that "[w]e became permanent guardian on 3-2 of 17, but we received a referral from Methodist on October 12th of '16." *Id.* at 24. She testified that, when CARE

received a referral from Methodist, D.W. was ready for discharge but was deemed incapacitated, that her family at that time was refusing to make decisions on her behalf, and she needed a guardian to make discharge plans.

[15]   Robertson testified that when D.W. is taking her prescribed medications, she is able to communicate with people that she trusts, can engage in her care and treatment, and can complete her ADL's on her own with minimal assistance. She testified that when D.W. is not taking her medication as prescribed, "[h]er thought processes has [sic] slowed way down," "[s]he's unable to communicate or carry on a conversation regarding treatment," "[s]he is very distrusting and paranoid," and she "[i]solates." *Id.* at 26. Robertson indicated she did not believe D.W. can be relied upon to take her prescribed medications independently. When asked about other treatment options, she testified that CARE has tried to connect D.W. with services with Adult and Child, that during the intake she became very paranoid and distrusting and refused to continue, and she did not want to commit to group therapies or their intensive outpatient services in the community where they would visit her at her apartment.

[16]   Robertson indicated that she did not believe D.W. can function independently at this time. She testified "when [D.W.] is in the community on her own she doesn't function independently," "[s]he needs assistance with medication management," and "[s]he needs twenty-four hour observation, transportation to treatments. Things that – services that don't exist for what is appropriate for [D.W.]." *Id.* at 27. When asked if she believed D.W. has difficulty feeding

herself appropriately, Robertson testified: "When [D.W.] is in the hospital, I believe she can feed herself appropriately because they serve meals. When she is in her apartment, she can walk to the store and by [sic] microwave meals. And feed herself that way, but do I think that it is adequate? No." *Id.* On cross-examination, Robertson indicated that D.W. can eat microwave meals and walk to the store on her own when taking medications.

[17] D.W.'s counsel argued that D.W. "should be committed to temporary instead of a regular." *Id.* at 39. The court stated:

> Well, in this matter there's no doubt that [D.W.] suffers from schizoaffective disorder . . . catatonic type. . . . The guardianship is not sufficient because she still is becoming catatonic. Still having to go to the hospital because even under the provisions of the guardianship, and a substitute caregiver for lack of a better term; decision maker. She is still lapsing into stages of catatonia. . . . Which, by the Doctor's testimony if that continues it could be lethal. The Court therefore will grant a regular commitment to . . . Methodist. . . .

*Id.*

[18] Although Dr. Metrick indicated D.W. was not malnourished and Robertson indicated D.W. could microwave meals and walk to the store when on her medications, Methodist elicited testimony that D.W. cannot be relied upon to take her medications without supervision and her recurrent hospitalization was occasioned in part by her non-adherence to treatment, that she needs assistance with medication management and twenty-four hour observation, that there was a rapid increase in recurrence of symptoms and decompensation after she

moved to an apartment, and that, when catatonia symptoms occur, she is unable to meet her needs. Dr. Metrick testified at length regarding D.W.'s prognosis and the symptoms she presents, and he testified that catatonia in its most extreme form can become malignant or lethal and that, without treatment, can be a terminal condition. Based upon the record, we conclude that clear and convincing evidence supports the trial court's finding that D.W. is gravely disabled for purposes of her involuntary commitment.

[19] To the extent D.W. asserts that the court erred in admitting certain hearsay testimony and the error was not harmless, we note that at one point during the commitment hearing Robertson began to testify "[t]he hospitalization before the current hospitalization, we received a phone call that . . . ," D.W. then objected on hearsay grounds, and the court sustained D.W.'s objection. Transcript Volume II at 28. According to the hearing transcript, immediately after the court sustained D.W.'s objection, Robertson testified: "CARE received a phone call from Methodist Hospital that [D.W.] was brought in by the police early in the morning. She was found on a bench outside of the convention center, catatonic. And had got lost on the bus through the night." *Id.* at 29. D.W. did not request the court to strike Robertson's testimony. We presume that the court, consistent with its own ruling, did not consider the challenged statements of Robertson and did not consider inadmissible evidence. *See Morfin v. Estate of Martinez*, 831 N.E.2d 791, 800 n.5 (Ind. Ct. App. 2005) (noting that we presume that a trial court in a bench trial rendered its judgment solely on the basis of admissible evidence); *see also Shanks v. State*, 640 N.E.2d 734, 736 (Ind.

Ct. App. 1994) (noting that, in a trial without a jury, it may be presumed that the judge will disregard inadmissible and irrelevant evidence). The trial court did not reference the challenged statements in either its comments at the commitment hearing or in its commitment order. Further, the other testimony elicited from Robertson and from Dr. Metrick as set forth above and in the record is sufficient to support the court's determination that D.W. is gravely disabled. *See Commitment of M.M. v. Clarian Health Partners*, 826 N.E.2d 90, 96 (Ind. Ct. App. 2005) (finding the improper admission of certain third-party statements was harmless as a doctor's testimony regarding his personal observations of M.M. during her detention adequately supported the commitment order). In light of the trial court's evidentiary ruling, the fact D.W. did not move to strike the challenged statements, the presumption the court did not consider inadmissible evidence, and the other unchallenged testimony elicited from Robertson and Dr. Metrick, we conclude that the fact the trial court did not interrupt and prohibit Robertson from making the challenged statements or explicitly strike the statements does not necessitate reversal.

## Conclusion

[20] The evidence supports the trial court's determination that D.W. is gravely disabled and its order of involuntary commitment. For the foregoing reasons, we affirm the trial court's September 22, 2017 Order of Regular Commitment of D.W.

Affirmed.

Bailey, J., and Crone, J., concur.