## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 29 2019, 7:41 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Megan Shipley
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Jenny R. Buchheit
Stephen E. Reynolds
Gregory W. Pottorff
Sean T. Dewey
Ice Miller LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Civil Commitment of M.T.

M.T.,

*Appellant*,

v.

Community Health Network Inc. of Marion County d/b/a Adult & Child MHC,

*Appellee*.

August 29, 2019

Court of Appeals Case No. 19A-MH-569

Appeal from the Marion Superior Court

The Honorable Melanie Kendrick, Judge Pro Tempore

Trial Court Cause No. 49D08-1901-MH-3702

**Brown, Judge.**

[1] M.T. appeals the trial court's February 7, 2019 Order of Temporary Commitment. We affirm.

*Facts and Procedural History*

[2] On January 28, 2019, Adult & Child MHC filed an Application for Emergency Detention of Mentally Ill Person, with information provided by V.L., who is M.T.'s brother, together with a physician's statement. On January 30, 2019, M.T. was admitted to the hospital, and on February 4, 2019, a Report Following Emergency Detention and a physician's statement signed by Dr. Kanwal Sidhu were filed. Dr. Sidhu's report stated that he believed M.T. was suffering from schizoaffective disorder and was gravely disabled.

[3] On February 7, 2019, the court held a hearing at which Dr. Sidhu, V.L., and M.T. testified. Dr. Sidhu testified that he is a psychiatrist with Community Hospital North, that M.T. was admitted by his outpatient clinic Adult & Child MHC because of worsening psychosis, and that he saw M.T. for an evaluation on January 30th. According to Dr. Sidhu, M.T. reported that he had been healed and that Jesus had been talking to him. He testified that M.T. "has euphoria, grandiosity, distractibility, poor sleep, [and] confusion" and that M.T. reported that "he had not eaten for three days and was surviving only on water and now because of the grace of God." Transcript Volume II at 5. He testified that M.T. had extreme paranoia, "was responding to internal stimuli which means he was hearing voices," reported that he had not been taking his medications "for a long time, over seven months," and "basically denied he had

any mental illness and his outpatient team was really worried about him because of his rapid decompensation due to his state of worsening psychosis and suicidal behaviors, so they admitted him." *Id*. Dr. Sidhu testified he had seen M.T. many times, he had seen him every year for at least three years, he saw him in 2013 when he was admitted, and "in two other circumstances but more of the suicidal behaviors." *Id*. at 6.

[4]   Dr. Sidhu indicated that, in August 2018, M.T. was admitted under his care and at that time M.T. was psychotic, delusional, and suicidal, that he had drank soap because voices told him to do so, and he talked about a plan to cut his throat with scissors. He testified that M.T. has a diagnosis of Schizoaffective Disorder Bipolar Type in which he has psychotic symptoms including paranoia, hearing voices, distractibility, poor concentration, and poor functioning as well as "some manic symptoms where he is euphoric, grandiose, he needs to sleep which leads to poor functioning – actually he is barely functioning. So we diagnosed him with having this [dis]order for many, many years." *Id*. at 7. He testified that M.T. "cannot function and is not able to do well in life." *Id*. When asked to give an example of how M.T. is exhibiting paranoia, Dr. Sidhu testified "[h]e is very guarded," "[t]hat is the first sign of paranoia that he will not reveal much and he looks around scared," "[h]e does that most of the day in the hospital," "he is paranoid about his family's intentions – about what they could do to him," "most of the paranoia tendered [sic] around religious themes, the devil," and "[t]his time he is not really talking about it as much as he is guarded." *Id*. He testified that M.T. "thinks Jesus talks to him and that he can

go without food for days at a time." *Id*. at 8.  He indicated that M.T. does not believe he has a mental illness, has refused to take any medications since he has been hospitalized, and does not think he needs medication.

When asked how M.T.'s Schizoaffective Disorder affects his ability to function independently, Dr. Sidhu testified that it affects his ability to hold a job, to function in society, and to have a stable place of residence, that he has to depend on his family for some of his needs, and that he has not been functioning well outside of the hospital.  When asked if there were tasks M.T. is unable to do because of his illness, he answered "holding a stable job," "[h]aving functioning relationships with other people," and "he is not eating and feeding himself properly because of his delusions."  *Id*. at 8.  When asked if he is able to provide himself with food clothing, shelter, and other essential human needs, Dr. Sidhu testified "not that I know of," that M.T. is not employed, and that he may have had odd jobs in the past but at this time he is unable to do those things on a stable basis due to his mental illness.  *Id*. at 9.  He indicated that M.T. is gravely disabled and that his opinion is based on M.T.'s chronic mental illness.  When asked if M.T. presented a substantial risk of harming himself, Dr. Sidhu testified that he had a lung collapse and that M.T. had told him that he wanted to slit his throat with scissors and one time had jumped off of a three-story building.  He testified that "having a mental illness places you at high risk when you are in an acute decompensated state," "[y]ou are likely to act on your impulses," "he has not told me that he wants to do that this time but he still is a risk because of not getting treated," and "I

know he had told me in the past that voices told him to drink soap" and that "he has talked about in the past about cutting his throat with scissors because of the mental illness – the voices." *Id*. at 10.

[6] When asked why a commitment for a period not to exceed ninety days was necessary to provide an improvement in M.T.'s condition, Dr. Sidhu testified "I think that the minimum amount of time we need for the medication to work and to . . . get a good treatment plan established for him with his counseling and group therapy, case management and . . . get some other (inaudible) solutions so he can have a long term outcome that is positive for him." *Id*. at 11. He testified that, if the commitment were granted, he planned to start M.T. on an injectable medication and have a case management team involved to help him with outpatient follow-up, that his living situation will determine if he is able to go back to live with his family or independently, that he would "have him establish with the outpatient team," and "[s]o he would stay in the hospital for about less than a week – he should be able to be discharged from the hospital and do outpatient follow up." *Id*. He indicated the medications he mentioned were used for the treatment of Schizophrenia, Schizoaffective Disorder, and Bipolar Disorder. He testified that M.T.'s condition "is pretty serious right now. With his psychosis." *Id*. at 12. He indicated that he believed the medications he prescribed will be a substantial benefit in treating M.T.'s mental illness, that the probable benefits from the proposed treatment with medication greatly outweigh the risk of harm and the personal concerns of the patient, that he did not believe that a less restrictive form of treatment

would be effective, and that M.T. responds well when he takes the medication, is able to function better, does not have the voices or paranoia, and is at less risk of causing himself harm.

[7]     V.L. testified that he is M.T.'s older brother and, when asked why he felt the need for the application for emergency detention, replied "[b]ecause since he has not been taking any medication, when he drive, he drive very fast – number one.  Number two, he – he said he was living in an apartment and – but – one time he left the door open and nobody was there in inside." *Id.* at 15.  He indicated that occurred on January 16, 2019.  V.L. testified when questioned as follows:

> A.     So me and my mom, we always go and check every day at his apartment to see if his car is parked in the parking lot.  And the day the door was left open – it was since, you know, since the whole day.  And then he was disappeared for like four or five days and by the time we know he was in . . . what do you call – Chicago.  And I had my best friend in Chicago – he went to their church.  He wanted to be member of their church.  And then one day he was outside – I mean outside the church parking lot under extreme weather.  And he was praying like half an hour at least.
>
> [M.T.'s Counsel]:  Objection.  Hearsay.  Move to strike the evidence.
>
> Q.     How did you come to learn about him being outside?
>
> A.     Because they took a picture and sent it to my phone.  I have that evidence in my phone.
>
> Q.     You had seen a picture of him outside the church parking lot?

A.     Yes.  Do you want to see that?  I do have that.

Q.     That is okay.

The Court:  Overruled.

Q.     Thank you.  So could you describe what you saw in the
       picture?

A.     He was sitting outside in the snow.  He was sitting and he
       was doing like this.

Q.     And when was that?

A.     I think it is on January twenty-first.  Yes, January twenty-
       first of this year.

Q.     You mentioned he drives very fast.  Could you describe your
       concern about that?

A.     If he does not obey the traffic signs, if there is a speed limit
       thirty – he does not – he does not know how to obey so he
       just drive.

Q.     Have you been with him in the car?

A.     No, my mom.

*Id*. at 16.  When asked what happens when M.T. stops taking his medications,

V.L. testified that his behavior changes, "he sometime kind of suicidal when he

is off of medication," and he is more aggressive, unrealistic, and cannot

socialize very well.  *Id*. at 17.  When asked about he and his mother checking

on M.T., V.L. replied "we just checked the parking lot to see if his car is

parking or not," "[s]o other day, his car was not parking there.  The door was

left," and "[s]o every day – like every three or four hours we went and checked

in front of his apartment just to see if his car is there."  *Id*. at 17-18.  When

asked what he observed personally that led him to believe M.T. was a danger to himself, V.L. testified "I would say the driving pattern . . . would be very dangerous to him and others too." *Id*. at 18. He also testified: "If he is taking medication, he is a very, very good person. If he is not taking medication, he is totally different person. So I will say if he is taking medication, everything will be fine. But since his denial in taking medication by saying, 'I have got delivered from God.' That is also kind of extreme religious belief too, which is unrealistic. So if he is taking any medication or if he got injection in a form of any kind of medication, he will be fine." *Id*. at 18-19. On cross-examination, when asked, "going to the car and to him speeding – have you ever been in the vehicle with him while he is doing that," V.L. answered "[n]o," and when asked "[a]nd just for purposes of the record, you were not in Chicago," V.L. replied "I was not in Chicago." *Id*. at 19.

[8] M.T. testified: "I was healed and delivered (inaudible) from my health condition since near the end of last year - about four months. I have not had my meds since about October last year. It has been October, November, December, January, February – about five months that I have no longer needed meds after receiving healing and deliverance from the Lord, Jesus Christ. To God all the glory." *Id*. at 20-21. He indicated he had a place to live and a vehicle, was filling out job applications, and going to job fairs.

[9] The trial court issued an Order of Temporary Commitment dated February 7, 2019, which found that M.T. is suffering from a psychiatric disorder which is a

mental illness and is gravely disabled.[1]  It found M.T. is need of custody, care, and treatment at Community Hospital North for a period not expected to exceed ninety days and ordered that, upon attaining outpatient status, M.T. was required to take all medications as prescribed, attend all clinic sessions as scheduled, and maintain a current address and phone number with the court and designated facility.

## *Discussion*

[10]   In Indiana, an individual who is alleged to be mentally ill and either dangerous or gravely disabled may be committed to a facility for not more than ninety days under Ind. Code §§ 12-26-6.[2]  The petitioner is required to prove by clear and convincing evidence that the individual is mentally ill and either dangerous or gravely disabled and detention or commitment of that individual is appropriate.  Ind. Code § 12-26-2-5(e)[3]; *Civil Commitment of T.K. v. Dep't of Veterans Affairs*, 27 N.E.3d 271, 273 (Ind. 2015).  The clear and convincing

---

[1] There is a checkmark in the field on the pre-printed form order to indicate that M.T. is gravely disabled and no checkmark in the fields indicating that he is dangerous to self or others.

[2] The Indiana Supreme Court has stated:

> In Indiana, an adult person may be civilly committed either voluntarily or involuntarily. Involuntary civil commitment may occur under four circumstances if certain statutorily regulated conditions are satisfied: (1) "Immediate Detention" by law enforcement for up to 24 hours, *see* Ind. Code § 12-26-4 et seq.; (2) "Emergency Detention" for up to 72 hours, *see* Ind. Code § 12-26-5 et seq.; (3) "Temporary Commitment" for up to 90 days, *see* Ind. Code § 12-26-6 et seq.; and (4) "Regular Commitment" for an indefinite period of time that may exceed 90 days, *see* Ind. Code § 12-26-7 et seq.

*Civil Commitment of T.K. v. Dep't of Veterans Affairs*, 27 N.E.3d 271, 273 n.1 (Ind. 2015).

[3] Ind. Code § 12-26-2-5 provides that it applies under Ind. Code §§ 12-26-6.

evidence standard is an intermediate standard of proof greater than a preponderance of the evidence and less than proof beyond a reasonable doubt. *See T.D. v. Eskenazi Health Midtown Cmty. Mental Health Ctr.*, 40 N.E.3d 507, 510 (Ind. Ct. App. 2015). In order to be clear and convincing, the existence of a fact must be highly probable. *Id.* In reviewing the sufficiency of the evidence supporting a determination requiring clear and convincing evidence, we will consider only the evidence favorable to the judgment and all reasonable inferences drawn therefrom, and we will not reweigh the evidence or judge the credibility of witnesses. *Id.*

[11] M.T. does not dispute the finding "that he suffered from a mental illness, Schizoaffective Disorder." Appellant Brief at 13. Rather, he challenges the finding that he is gravely disabled. Ind. Code § 12-7-2-96 provides:

> "Gravely disabled", for purposes of IC 12-26, means a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:
>
>> (1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or
>>
>> (2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

[12] M.T. argues that the evidence does not show that he was unable to provide for his own needs or function independently, that prior to his hospitalization he lived independently in an apartment and was looking for work, that his behavior did not rise beyond idiosyncratic behavior, and that an adult's failure

to communicate with his family for four or five days is not evidence that he is gravely disabled. He contends that denial of illness and refusal to medicate standing alone are insufficient to establish grave disability, he started eating again in the hospital, and there was no evidence he was malnourished. He argues that, while Dr. Sidhu testified that he had a history of suicidal thoughts and actions and at some unspecified point in the past he jumped off of a building and stated he wanted to slit his throat, he did not have any such active suicidal behaviors at the time of his hospitalization in January and February 2019 and the court did not find that he was dangerous to himself. He also argues the court erred in admitting V.L.'s testimony regarding what his friend in Chicago told him. Community Health Network, Inc., maintains that it proved by clear and convincing evidence that M.T. is gravely disabled under Ind. Code § 12-7-2-96(1) and (2). It also argues that V.L.'s testimony regarding what he observed in a photograph of M.T. is not hearsay and that, even if it was hearsay, admission of the testimony was harmless.

[13] The record reveals Dr. Sidhu's testimony that M.T. presented with "euphoria, grandiosity, distractibility, poor sleep, [and] confusion," had not eaten for three days, had "extreme paranoia," was responding to internal stimuli or hearing voices, and reported that he had not taken his medications for over seven months. Transcript Volume II at 5. Dr. Sidhu testified regarding M.T.'s diagnoses, history, and symptoms. He testified that M.T. was "barely functioning." *Id.* at 7. He testified that M.T. thinks that he can go without food for days at a time. He indicated that M.T. refused to take any

medications. He indicated M.T.'s disorder affects his ability to maintain employment and a residence and function in society. He testified that M.T. was "not eating and feeding himself properly because of his delusions." *Id*. at 8. Dr. Sidhu also testified regarding M.T. presenting in the past with a collapsed lung and his reports of jumping from a building, wanting to cut his throat, and voices telling him to drink soap. He testified that M.T.'s condition "is pretty serious right now. With his psychosis." *Id*. at 12. Further, V.L. testified regarding M.T.'s behavior and how, when he does not take his medication, he is more aggressive, more unrealistic, and cannot socialize well. The court also heard M.T.'s testimony indicating his belief that he did not need medication. It also heard Dr. Sidhu's testimony regarding the anticipated treatment and follow-up outpatient services.

[14] Based upon the record, we conclude that clear and convincing evidence supports the trial court's determination that M.T. was gravely disabled for purposes of his involuntary commitment. As to M.T.'s assertion the court erred in admitting certain hearsay testimony, we note that V.L. testified regarding a photograph of M.T. and what it depicted, specifically, that it showed M.T. "sitting outside in the snow . . . doing like this." Transcript Volume II at 16. To the extent V.L.'s testimony included inadmissible hearsay, we will presume the trial court did not consider the challenged statements. *See Morfin v. Estate of Martinez*, 831 N.E.2d 791, 800 n.5 (Ind. Ct. App. 2005) (noting that we presume that a trial court in a bench trial rendered its judgment solely on the basis of admissible evidence). Further, the other testimony elicited from Dr. Sidhu and

V.L. as set forth above and in the record is sufficient to support the court's determination that M.T. was gravely disabled. *See Commitment of M.M. v. Clarian Health Partners*, 826 N.E.2d 90, 96 (Ind. Ct. App. 2005) (finding the improper admission of certain statements was harmless as a doctor's testimony regarding his personal observations of M.M. during her detention adequately supported the commitment order), *trans. denied*.

[15] For the foregoing reasons, we affirm the trial court's February 7, 2019 Order of Temporary Commitment of M.T.

[16] Affirmed.

Altice, J., and Tavitas, J., concur.